Joshua **WOHLSTEIN**, Appellant,

v.

**Ron ALIEZER and ASW Allstate Painting & Construction, Inc.,** Appellees.

No. 14–08–00751–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 17, 2010.

Rehearing Overruled Sept. 16, 2010.

---

John Hatchett McFarland, William G. "Bud" Arnot III, Houston, for appellant.

Robert A. Axelrad, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices SEYMORE and SULLIVAN.

## OPINION

KENT C. SULLIVAN, Justice.

Appellant, Joshua Wohlstein, sued a professional rival, appellee Ron Aliezer, for interfering with—and causing the breakup of—his business partnership. The trial court granted summary judgment to Aliezer and his company, appellee ASW Allstate Painting & Construction, Inc. ("ASW"), prompting this appeal.

We conclude the evidence raises a fact issue as to some of Wohlstein's claims for tortious interference and fraudulent transfer. Therefore, we reverse those portions of the trial court's judgment. Otherwise, we affirm as to the remaining causes of action.

### I.

#### BACKGROUND

The relevant facts, viewed in the light most favorable to Wohlstein,[1] recount a series of business transactions between a construction contractor, Ofer Manashe, and two of his subcontractors, appellant Wohlstein and appellee Aliezer. Manashe plays a significant role in these underlying facts but is not a party to this appeal.[2]

In early 2005, Manashe, the owner and operator of Sandstone Construction, Inc. ("Sandstone"), agreed to a series of construction contracts for the renovation of twelve apartment complexes. However, because he had planned to leave the country for several months that year, he worried about Sandstone's ability to complete the work in his absence.

Therefore, he approached Wohlstein, one of his subcontractors, and proposed an arrangement whereby Wohlstein would complete the projects on Sandstone's behalf, in exchange for a fifty-percent share in the profits from those jobs. According

---

1. *See Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). Although appellees tell a different version of this story, to the extent of any conflicts in the summary-judgment evidence, we are bound to accept Wohlstein's account. *See id.*

2. The trial court severed Wohlstein's claims against appellees from the main lawsuit against Manashe, and this appeal arises from those severed claims.

to Wohlstein, the parties also discussed a similar agreement covering a series of *future* construction projects to occur in 2006 and 2007.

Wohlstein agreed to this oral proposal, which was never reduced to writing. He has described his relationship with Manashe, at least with respect to those twelve construction projects, as a "partnership." Nevertheless, Wohlstein apparently held himself out to others, including Aliezer, as merely a "supervisor" for Sandstone. Whatever his *actual* role within Sandstone—which is disputed—he was designated sole signatory on the company's bank account during Manashe's absence.

By January 2006, Sandstone had completed all twelve construction projects and, by doing so, earned roughly $2.4 million in net profits. Wohlstein asserts, under the terms of his oral contract with Manashe, he is entitled to half that amount, or $1.2 million. However, his demand has not been paid because, once the work was complete, Manashe allegedly reneged on the agreement to share profits with Wohlstein.[3]

Wohlstein blames his rival Aliezer, at least in part, for Manashe's refusal to honor their partnership agreement. Aliezer, who has been Manashe's friend for more than thirty years, admitted he was offended by his exclusion from the lucrative apartment-renovation projects[4] and made his displeasure known to Manashe:

> Q. Is it accurate to say that you felt like Sandstone Construction should have awarded those 12 jobs to ASW Allstate?
> A. Of course. Yes. That was my understanding to begin with.

. . . .

> Q. Did you ever advise Ofer Manashe that you felt it was unfair that he had awarded those contracts or that he decided to pursue those contracts with Joshua Wohlstein instead of with ASW Allstate?
> A. I did tell him about this.

Appellant claims that, in response to that conversation, Manashe agreed to renege on his partnership agreement with Wohlstein. That plan, however, was not without obstacles. Because Wohlstein was sole signatory on Sandstone's bank account, once expelled from the partnership, he could simply write himself a check covering his $1.2 million share of net profits. To guard against that possibility, Manashe and Aliezer allegedly conspired to empty the Sandstone account *before* notifying Wohlstein of his ouster from the partnership.

Thus, in late January 2006, Aliezer asked Wohlstein, reportedly on Manashe's behalf, to withdraw a large sum of money from the Sandstone account. Aliezer represented the money would be wired overseas to Manashe, who had become cash-strapped and in need of funds. Wohlstein accommodated the request and wrote Aliezer several checks totaling $1,090,000. These withdrawals effectively depleted the Sandstone account.[5]

However, Aliezer did not wire the money to Manashe as promised. Instead, he deposited the funds directly into an account belonging to his own company, ASW. He then filed at least four assumed-name certificates with the Harris County clerk,

---

**3.** Manashe has denied the existence of any agreement, oral or otherwise, to share profits with Wohlstein.

**4.** Appellant suggests Manashe chose him for these projects, instead of Aliezer, because he offered Manashe a greater share of profits (fifty percent) than Aliezer customarily did (fifteen percent).

**5.** The record does not indicate the whereabouts of the remaining profits from the $2.4 million construction project.

listing himself as the sole owner of four new Sandstone companies: Sandstone Construction, Sandstone Painting, Sandstone Construction and Painting, and Sandstone Painting and Construction.

Through those new entities, Aliezer purported to take over Sandstone's business, evidently with Manashe's approval. Manashe informed appellant that the business had been sold to Aliezer, and he further notified Sandstone's clients that Wohlstein was no longer affiliated with the company.

Wohlstein immediately filed suit against Manashe, Sandstone, Aliezer, and ASW. Aliezer and ASW filed a traditional and no-evidence motion for summary judgment. The court granted the motion without specifying the basis for its ruling. Following severance, the summary judgment became final.

This appeal followed. Generally, appellant contends the trial court erred by granting summary judgment[6] because the record raises a fact issue as to his claims for tortious interference, participation in breach of fiduciary duty, fraud, negligent misrepresentation, conspiracy, and fraudulent transfer.

## II.

### STANDARD OF REVIEW

The standards we use to review a summary-judgment order are well-settled. *See Seidner v. Citibank (S.D.) N.A.*, 201 S.W.3d 332, 334 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). A party seeking summary judgment must demonstrate his entitlement to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). If the evidence establishes the movant's apparent right to summary judgment, the burden then passes to the non-

movant to raise a genuine issue of material fact to defeat the motion. *See Va. Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 402 (Tex.App.-Houston [14th Dist.] 2009, pet. denied).

On appeal, we review the summary-judgment motion and evidence *de novo*. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005). We must consider the evidence in the light most favorable to the non-movant—here, Wohlstein—while indulging reasonable inferences and resolving doubts in his favor. *See City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005); *Va. Power*, 297 S.W.3d at 402. When the summary-judgment order fails to specify the basis for the trial court's ruling, as here, we will affirm on any meritorious argument advanced in the motion. *See Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 173 (Tex.1995); *Ortiz v. Collins*, 203 S.W.3d 414, 420 (Tex.App.-Houston [14th Dist.] 2006, no pet.). In that scenario, the appellant must therefore demonstrate the trial court could not properly grant summary judgment on any ground asserted in the motion. *See Chappell Hill Bank v. Smith*, 257 S.W.3d 320, 324 (Tex.App.-Houston [14th Dist.] 2008, no pet.).

## III.

### ANALYSIS

In his petition, Wohlstein advanced six causes of action against appellees: (1) tortious interference, (2) participation in breach of fiduciary duty, (3) fraud, (4) negligent misrepresentation, (5) civil conspiracy, and (6) violation of the Texas Uniform Fraudulent Transfer Act ("TUFTA"). These multiple theories may be grouped,

---

**6.** Appellant does not challenge the trial court's rulings denying his motion for recon-

sideration and motion for new trial.

for the sake of disposition, into two general allegations of wrongdoing.

First, Wohlstein contends appellees improperly interfered in his relationship with Manashe, causing the latter to breach their partnership agreement, and thereby deprived appellant of an equal share of Sandstone's past and future profits. Second, appellant claims appellees tricked him into voluntarily transferring $1,090,000 out of the partnership's bank account and into ASW's coffers. We will address each group separately, beginning with Wohlstein's interference-related claims.

## A. Interference–Related Claims

This set of claims encompasses two causes of action: tortious interference and knowing participation in breach of fiduciary duty. Both theories arise from the same operative facts. Specifically, appellant contends Aliezer encouraged Manashe to expel Wohlstein from the alleged partnership and, in so doing, breach various fiduciary duties owed him.

### 1. Tortious Interference

The parties further subdivide Wohlstein's tortious-interference allegations into two distinct subsets: (1) interference with the oral partnership agreement respecting the twelve apartment-renovation projects in 2005, and (2) interference with an agreement to collaborate on future construction jobs in 2006 and 2007. Because appellees presented different summary-judgment grounds for these two categories, we handle each group separately.

#### a. 2005 Projects

As to the already-completed work, appellees presented two grounds for traditional summary judgment.[7] We find no merit in either argument.

■ First, appellees argued that Wohlstein, in his deposition, expressly disavowed any claim for tortious interference during the following exchange:

Q. [W]hen you mentioned earlier what claims you had against my client [Aliezer], you mentioned ... that you have a claim against my client for interfering with your contract. Do you remember saying that?

A. Yes. But that's not a claim that I made, 1 just responded to him. He said something about I interfered with him, so I said, you know, I—it's not my claim.

Q. Okay. So that's not what you're claiming?

MR. McFARLAND: Form.

Q. So that's—I'm sorry. That's not what you're claiming?

MR. McFARLAND: Form.

A. No.

However, even were we to read that portion of the deposition as some sort of binding admission, Wohlstein clarified that testimony through an errata sheet that accompanied the signature page to his deposition. Noting he had misunderstood counsel's questions,[8] Wohlstein corrected that testimony to read, "It is my claim." See Tex.R. Civ. P. 203.1(b) (permitting a

7. Appellees presented a no-evidence point relating to the 2006/2007 projects but not those undertaken in 2005. Specifically, he argued in his motion:

> There is no evidence that Aliezer had knowledge of the alleged *2006/2007 agreement* or of Wohlstein's alleged interest in it or that Aliezer had knowledge of such facts and circumstances that would lead a reasonable person to believe that mere was a

contract in which Wohlstein had an interest. . . .

... There is no evidence that Aliezer took an active part in persuading Manashe and Sandstone to terminate the alleged *2006/2007 agreement* between Wohlstein and Sandstone.

(Emphases added).

8. During oral argument, counsel confirmed English is not appellant's native language.

witness to make corrections or revisions to his deposition testimony). Therefore, that equivocal testimony, later revised, cannot form the basis for summary judgment.

Second, Aliezer testified, by affidavit, that he was unaware of *any* partnership involving Wohlstein—inasmuch as he had been told appellant was simply a "supervisor"—and therefore could not be liable for the *intentional* tort of interference. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex.2002) (confirming a tortious-interference claim requires proof that the defendant willfully and intentionally interfered with the claimant's contract). Specifically, Aliezer testified:

> In 2005, I was told by Joshua Wohlstein that he was working for Ofer Manashe as a supervisor for $3,000 per month. I had no knowledge of the existence of any other alleged agreements between Wohlstein and Sandstone, or of the alleged terms of any other alleged agreement between Wohlstein and Sandstone, until after the relationship between Wohlstein and Sandstone terminated in mid-February of 2006.

However, summary judgment should generally not be granted as to issues of knowledge or intent because the non-movant cannot readily controvert a defendant's self-serving denials. *See* Tex.R. Civ. P. 166a(c) ("A summary judgment may be based on uncontroverted testimonial evidence of an interested witness ... if the evidence ... could have been readily controverted."); *Frias v. Atl. Richfield Co.*, 999 S.W.2d 97, 106 (Tex.App.-Houston [14th Dist.] 1999, pet. denied); *RRR Farms, Ltd. v. Am. Horse Prot. Ass'n Inc.*, 957 S.W.2d 121, 132 (Tex.App.-Houston [14th Dist.] 1997, pet. denied). Here, the factfinder's determination of appellees' knowledge and intent turns, at least in part, upon Aliezer's credibility. *See Frias,* 999 S.W.2d at 106. Therefore, the trial court could not properly grant summary judgment on that basis. *See id.*

Here, neither ground asserted by appellees supports summary judgment on tortious interference arising from the 2005 construction projects. Therefore, we reverse that portion of the judgment.

#### b. 2006/2007 Projects

However, we affirm summary judgment as to alleged interference with the 2006/2007 construction contracts because appellant did not challenge every ground asserted below. Specifically, appellees moved for traditional summary judgment on their affirmative defense of justification.[9] *See Butnaru,* 84 S.W.3d at 207; *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77–78 (Tex. 2000); *Baty v. ProTech Ins. Agency,* 63 S.W.3d 841, 857 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). Wohlstein did not respond to that argument in its summary-judgment response or appellate brief.

An appealing party must challenge and negate all possible grounds on which summary judgment could have been granted; otherwise, we must uphold the judgment on that basis. *See Chappell Hill Bank,* 257 S.W.3d at 324; *De Laurentis v. United Servs. Auto. Ass'n,* 162 S.W.3d 714, 726 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). Because Wohlstein failed to do so, we affirm that portion of the judgment. *See Chappell Hill Bank,* 257 S.W.3d at 324.

### 2. Participation in Breach of Fiduciary Duty

Similarly, Wohlstein did not respond to a no-evidence summary-judg-

9. Appellees also contend the oral contract was unenforceable under the Statute of Frauds. Because we affirm on other grounds, we need not address that argument. *See* Tex.R.App. P. 47.1.

ment ground raised in response to his claim for knowing participation in breach of fiduciary duty. Specifically, appellees denied liability because there was no evidence Aliezer knew of the existence of any relationship giving rise to such duties.[10] See *Baty*, 63 S.W.3d at 863 ("[W]here a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such.") (emphasis added) (citations omitted).

As previously noted, issues of intent and knowledge are generally inappropriate for summary judgment. *See Frias*, 999 S.W.2d at 106. Nevertheless, because appellant wholly failed to respond to a no-evidence point, the trial court was obligated to grant the motion. *See* Tex.R. Civ. P. 166a(i) (stating a court *must* grant a no-evidence motion absent a response raising a genuine issue of material fact); *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008); *Arguelles v. Kellogg Brown & Root, Inc.*, 222 S.W.3d 714, 723 (Tex.App.-Houston [14th Dist.] 2007, no pet.).

Accordingly, we affirm that portion of the trial court's judgment.

### B. Transfer-Related Claims

Wohlstein's second category of claims—fraud, negligent misrepresentation, conspiracy, and fraudulent transfer—arise from Aliezer's allegedly deceitful removal of money from the partnership bank account. Generally, appellant contends Aliezer misrepresented his plans to wire the withdrawn funds to Manashe, at the latter's request, when his *actual* intent was simply to wrest the money from Wohlstein's control.[11]

### 1. Fraud and Negligent Misrepresentation

■ Appellees moved for summary judgment on fraud and negligent misrepresentation, arguing Wohlstein did not incur any damages as a result of the transfer.[12] *See Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (confirming fraud claim requires proof of some legal injury); *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651, 696 (Tex.App.-Houston [14th Dist.] 2006, pet. denied) (requiring proof of pecuniary loss to support negligent-misrepresentation claim). In support, they offered Wohlstein's deposition testimony, in which he (1) denied any ownership interest in the transferred funds and (2) admitted Sandstone—and, by extension, Manashe—could freely distribute its own money in its sole discretion.

While conceding those evidentiary points, Wohlstein suggests he suffered a legal injury because, although he did not own the funds in Sandstone's account, the

---

10. Specifically, Aliezer argued, "as set forth above, there is no evidence that Aliezer had any knowledge of the alleged joint venture relationship between Sandstone and Wohlstein or of the terms of any such alleged relationship."

11. Notably, Wohlstein did not assert a conversion claim against Aliezer. *See Hunt v. Baldwin*, 68 S.W.3d 117, 131 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

12. In addition, appellees asserted (1) Aliezer's alleged misrepresentation was immaterial and insufficient to support a fraud claim, and (2)

Wohlstein did not rely on Aliezer's promise to send money overseas, and therefore had no viable claim for fraud or negligent misrepresentation. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001) (listing elements of common-law fraud); *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999) (stating elements of negligent misrepresentation). Because we affirm summary judgment on other grounds—the absence of recoverable damages—we need not address these alternative contentions. *See* Tex.R.App. P. 47.1.

transfer reduced his bargaining "leverage" with Manashe. He testified:

> [T]hese funds had nothing to do with the money that [Aliezer] wants to, you know, move overseas.
>
> It wasn't his money in the first place and he basically—he—he defraud[ed] me. He lied to me, kept telling me that's the reason he did it. *He did it to get the funds out of the account so, at the end of the day, him and—he—I mean Ofer Manashe and he would have all the money in their possession and they can basically tell me to—to take a hike.*
>
> . . . .
>
> I was worse off just from the fact that the money was, you know, got out of my account. I had nothing to do with the money going overseas. It has nothing— none of my business, if he didn't move it or whatever. I was worse off because *the funds got out of my control.*
>
> . . . .
>
> . . . I'm suing Ronnie Aliezer because . . . he lied to me about the way to do it by telling me he can move the money overseas—overseas to *put Ofer in a better bargaining position later on or him helping him, for me to—to—how much money I would get for the jobs I performed.*[13]

His briefing reframes that testimony as follows:

> Aliezer's inducing [Wohlstein] into transferring $1,090,000 out of his control so that Sandstone could effectively renege on the obligation to pay him his share of the profits on the twelve projects caused him damages. . . .
>
> . . . The point was that Wohlstein would not have the funds on hand when Manashe pulled the plug on the relationship and refused to pay him his share[.]

But, as this court has observed, Texas law does not currently recognize "lost bargaining leverage," by itself, as a legally compensable injury.[14] *See Swanson v. Wells Fargo Home Mtge.*, No. 14–02–00732–CV, 2003 WL 22945646, at *3 (Tex. App.-Houston [14th Dist.] Dec. 16, 2003, no pet.) (mem. op.). *Swanson* featured this same legal issue in a slightly different factual context, and therefore merits some further discussion.

The dispute in *Swanson* involved a construction loan agreement that required written authorization by the homeowners—the Swansons—before funds could be disbursed to the home builder. *See id.* at *1. Notwithstanding that clause, the lender—Norwest—made several disbursements to the builder without seeking the Swansons' approval. *See id.* The Swansons later discovered multiple construction defects in their home but were unable to locate the builder, so they sued the lender instead. *See id.* at *1 n. 1. They contended Norwest breached the loan agreement by making unauthorized disbursements to the builder, and they sought damages for the cost to remedy the construction defects. *See id.* at *1.

---

13. Emphases added.

14. Our research also uncovered other jurisdictions that apparently decline to recognize "lost bargaining leverage" as a recoverable element of damages. *See Steffen v. Akerman Senterfitt*, No. 804CV1693T24MSS, 2005 WL 3277894, at *7 (M.D.Fla. Dec. 2, 2005) ("This Court finds that the injury alleged by Plaintiff, i.e., loss of negotiating leverage, is too speculative to support the causation element of Plaintiffs legal malpractice claim."); *In re Belmar*, 319 B.R. 748, 757 (Bankr.D.D.C. 2004) ("It is highly questionable whether, under District of Columbia law, the Belmars's alleged 'loss of leverage' constitutes a legally cognizable harm . . ."); *Jarrell v. Petoseed Co.*, 331 S.C. 207, 500 S.E.2d 793, 796 (1998) ("Possible loss of leverage at the bargaining table . . . does not translate to actual damages.").

Norwest moved for summary judgment, arguing its conduct did not cause the Swansons' alleged damages. *See id.* at \*2. In response, the claimants insisted Norwest, by paying the builder without their consent, deprived them of "leverage" they could have wielded to withhold payment and thereby force the builder to correct the defects. *See id.* at \*2–\*3. This court declined to recognize that claim:

> To recover compensatory damages [for breach of contract], the plaintiff must prove that he suffered some pecuniary loss as a result of the breach. The evidence must demonstrate the damages are the natural, probable, and foreseeable consequence of the defendant's conduct. The right to recover for the breach of a contract will be defeated if (1) no damage was suffered by the complaining party despite the breach, or (2) if the damages which he sustained did not result from the breach. . . .
>
> . . . The Swansons . . . claim that by not obtaining their consent to disbursement requests, they did not have an "opportunity to stop construction to alleviate defects."
>
> . . . .
>
> The alleged "damage" to the Swanson's, *i.e.*, lack of leverage, was not a foreseeable consequence of Norwest's purported breach of the loan agreement.

*Id.* (citations omitted). Accordingly, this court affirmed summary judgment on all claims. *See id.* at \*3.

Here, as in *Swanson*, the claimant has not shown he incurred any legal injury solely as a result of the transfer. To the contrary, Wohlstein conceded his lost-profits claim against Manashe does not hinge on the *physical location* of the funds withdrawn from Sandstone's bank account. Therefore, we affirm summary judgment as to those claims—fraud and negligent misrepresentation—which require proof of damages as a prerequisite to recovery.

### 2. Conspiracy to Commit Fraud

■■ Finding no viable fraud claim, we must also affirm summary judgment on Wohlstein's derivative claim for conspiracy to commit fraud. A successful claim for civil conspiracy requires proof that two or more persons, with the mutual intent to achieve some goal, committed one or more overt and unlawful acts, thereby resulting in damages to the claimant. *See Baty*, 63 S.W.3d at 864. Civil conspiracy is often described as a "derivative tort" because a defendant's liability requires proof of his participation in another underlying tort for which the plaintiff seeks to hold him liable. *See id.* (citing *Tilton v. Marshall* 925 S.W.2d 672, 681 (Tex.1996)).

Here, the underlying tort, according to Wohlstein's pleadings, was fraud. However, we have already determined the trial court properly granted summary judgment as to fraud. Therefore, we must affirm summary judgment on Wohlstein's derivative claim for conspiracy to commit fraud. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 583 (Tex. 2001) (holding summary judgment as to fraud claim disposed of dependent conspiracy claim); *Rodarte v. Investeco Group, L.L.C.*, 299 S.W.3d 400, 413 (Tex.App.-Houston [14th Dist.] 2009, no pet.); *Baty*, 63 S.W.3d at 864.

### 3. Fraudulent Transfer

However, a successful claim under the Texas Uniform Fraudulent Transfer Act ("TUFTA") does not require proof of actual damages resulting from a transfer. *See* Tex. Bus. & Comm.Code Ann. §§ 24.005–.006 (Vernon 2009) (setting forth elements of fraudulent-transfer claim). Thus, Wohlstein's inability to demonstrate actual damages—though fatal to his claims for fraud and negligent misrepresentation and, by extension, conspiracy—does not necessarily affect his claims under TUFTA.

TUFTA was designed to prevent a debtor from defrauding its creditors by moving assets out of reach. *See Mladenka v. Mladenka,* 130 S.W.3d 397, 404 (Tex.App.-Houston [14th Dist.] 2004, no pet.). To accomplish that end, TUFTA permits a creditor, under certain circumstances, to set aside a debtor's fraudulent transfer of assets. *See* Tex. Bus. & Comm.Code Ann. § 24.008(a) (Vernon 2009); *Goebel v. Brandley,* 174 S.W.3d 359, 362 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). A transfer may be considered fraudulent, under the relevant portions of the statute,[15] if done with "actual intent to hinder, delay, or defraud any creditor of the debtor." Tex. Bus. & Comm.Code Ann. § 24.005(a)(1).

In this case, appellees presented three summary-judgment grounds, arguing (1) Wohlstein sought only money damages which, they insist, cannot be recovered under TUFTA; (2) appellees did not qualify as "transferees," and therefore cannot be held liable under TUFTA, because they did not exercise legal dominion or control over the transferred funds; and (3) there was no evidence of Manashe's intent to "hinder, delay, or defraud" Wohlstein. We find these arguments unconvincing, and therefore reverse summary judgment as to Wohlstein's TUFTA claims.

### a. Recoverability of Money Damages Under TUFTA

First, appellees suggest Wohlstein's request for money damages runs afoul of section 24.008, which entitles a successful claimant to avoid "the transfer or obligation to the extent necessary to satisfy the creditor's claim." *Id.*

§ 24.008(a)(1). We disagree. Chapter 24 authorizes both equitable relief—that is, nullification of a fraudulent transfer—and money damages up to the value of the property transferred. *See id.* §§ 24.008, 24.009(b), (c); *Chu v. Hong,* 249 S.W.3d 441, 446 (Tex.2008). Accordingly, the trial court could not properly grant summary judgment on that basis.

### b. Appellees' Status as Transferees

Second, appellees contend this transaction does not qualify as a "transfer," and therefore is not governed by TUFTA, because they did not receive the money as "transferees." In support, appellees cite *Newsome v. Charter Bank Colonial,* in which this court defined a "transferee" as one with "legal dominion or control over the funds ... [and] the right to put the money to one's own use." 940 S.W.2d 157, 165 (Tex.App.-Houston [14th Dist.] 1996, writ denied). Stated differently, a party is a "transferee," within the meaning of TUFTA, if it could freely "invest the whole [amount] in lottery tickets or uranium stocks," if it so desired. *Id.* (quoting *Matter of Coutee,* 984 F.2d 138, 141 (5th Cir.1993)).

Under that definition, a bank impounding funds under a writ of garnishment would not qualify as a transferee, nor would a law firm holding its client's money in trust, because neither could freely spend the funds in its possession. *See Newsome,* 940 S.W.2d at 166; *Coutee,* 984 F.2d at 141. This case, however, does not resemble either of those scenarios.

Instead, the evidence indicates appellees accepted the transferred funds as an advance relative to various construction projects.[16] The record suggests no limitations

---

**15.** The statute also disallows other kinds of fraudulent transfers not germane to this dispute. *See* Tex. Bus. & Comm.Code Ann. §§ 24.005(a)(2), 24.006.

**16.** Aliezer testified, by affidavit: "In late January and early February of 2006, Joshua Wohlstein delivered funds from and/or on behalf of Sandstone to ASW totaling $1,090,000. These payments were advances to ASW on various projects on which ASW was working for Sandstone in or about the first quarter of 2006."

on their use of these funds. Therefore, we hold the evidence raises a fact issue under TUFTA. *See Walker v. Anderson,* 232 S.W.3d 899, 916–17 (Tex.App.-Dallas 2007, no pet.) (holding loan advances qualified as "transfers" under TUFTA). Accordingly, the trial court could not have properly granted summary judgment on that basis.

### c. Evidence of Intent to Defraud

 Third, appellees claim the record contains no evidence of Manashe's intent to "hinder, delay, or defraud" Wohlstein, a necessary element of his TUFTA cause of action. *See* Tex. Bus. & Comm. Code Ann. § 24.005(a)(1). However, that issue is not appropriate for summary judgment, except in limited circumstances not present here,[17] because intent, like knowledge, is a question of fact generally reserved for the jury. *See Hahn v. Love,* 321 S.W.3d 517, 525–29 (Tex.App.-Houston [1st Dist.] 2009, pet. denied); *Coleman Cattle Co. v. Carpentier,* 10 S.W.3d 430, 433–34 (Tex.App.-Beaumont 2000, no pet.).

 Moreover, Wohlstein presented evidence raising a fact question as to Manashe's intent to defraud which, in the absence of direct proof, may be shown through circumstantial evidence. *See Mladenka,* 130 S.W.3d at 405. Under section 24.005(b), fraudulent intent may be inferred from a consideration of several non-exclusive factors, sometimes called "badges of fraud." *See id.* (citing Tex. Bus. & Comm.Code Ann. § 24.005(b)). Although there is no magic number of factors that must exist, the presence of several "badges" may support an inference of fraud. *See id.; Walker,* 232 S.W.3d at 914; *G.M. Houser, Inc. v. Rodgers,* 204 S.W.3d 836, 843 (Tex.App.-Dallas 2006, no pet.).

 Here, the record contains at least some evidence of several "badges" which, if believed,[18] could support an inference of fraudulent intent, including:

- the transfer was made to an "insider";[19]
- the debtor—Sandstone—ultimately retained possession or control of the funds after the transfer;[20]
- the transfer was of substantially all Sandstone's assets;[21] and
- the transfer occurred at a time—January through February 2006–shortly before or after Sandstone incurred a

---

17. Specifically, intent to defraud may be decided as a matter of law if the defendant confesses to fraud or the evidence *conclusively establishes* the absence of such intent. *See Mladenka,* 130 S.W.3d at 405 n. 13; *Coleman Cattle Co. v. Carpentier,* 10 S.W.3d 430, 434 (Tex.App.-Beaumont 2000, no pet.). Appellees make no such contention here.

18. *See City of Keller,* 168 S.W.3d at 824; *Va. Power,* 297 S.W.3d at 402.

19. Section 24.002(7) provides a few examples of "insiders," but its list is considered illustrative rather than exhaustive. *See* Tex. Bus. & Comm.Code Ann. § 24.002(7) (Vernon 2009); *Hahn,* 321 S.W.3d at 525–26, n. 8; *Jackson Law Office, P.C. v. Chappell,* 37 S.W.3d 15, 25–26 (Tex.App.-Tyler 2000, pet. denied). Instead, insider status is to be determined by considering (1) the closeness of the relation-

ship between the debtor and transferee, and (2) whether the transaction was conducted at arm's length. *See Hahn,* 321 S.W.3d at 525–26, n. 8; *Jackson Law Office,* 37 S.W.3d at 26.

After considering the evidence relating to those two factors, we conclude a fact issue exists as to Aliezer's status as an "insider" to Manashe. The record contains few details about their actual dealings leading up to the transfer of funds. However, the evidence reflects they had been friends for over thirty years and frequently worked together, facts indicative of a fairly close relationship.

20. Specifically, Aliezer testified the transferred funds were ultimately returned to Sandstone.

21. Manashe admitted the Sandstone bank account was almost empty after the transfer to ASW and Aliezer.

substantial debt to Wohlstein, who claimed a fifty-percent interest in profits from construction projects that had just been completed in January 2006.

*See* Tex. Bus. & Comm.Code Ann. § 24.005(b)(1), (2), (5), (10). We hold that evidence, considered in the light most favorable to Wohlstein, raises a fact issue precluding summary judgment as to Manashe's fraudulent intent. *See Mladenka,* 130 S.W.3d at 405. Accordingly, we reverse judgment on Wohlstein's fraudulent-transfer claims under chapter 24.

### C. Mental Anguish Damages

Finally, the trial court granted summary judgment on Wohlstein's request for an award of mental anguish damages. He does not challenge that ruling on appeal. Therefore, we affirm the trial court's judgment as to that claim. *See Sonic Sys. Int'l, Inc. v. Croix,* 278 S.W.3d 377, 389 n. 19 (Tex.App.-Houston [14th Dist.] 2008, pet. denied); *see also Garcia v. State Farm Lloyds,* 287 S.W.3d 809, 820–21 (Tex.App.-Corpus Christi 2009, pet. denied) (affirming summary judgment on claimant's alleged mental-anguish damages); *Rivera v. Countrywide Home Loans, Inc.,* 262 S.W.3d 834, 842 (Tex. App.-Dallas 2008, no pet.) (same).

## IV.

### CONCLUSION

We hold the evidence raises a fact issue that precludes summary judgment on Wohlstein's claims that appellees (1) tortiously interfered with his 2005 construction contract and (2) participated in a fraudulent transfer of assets under chapter 24 of the Texas Business and Commerce Code. Therefore, we reverse summary judgment as to those claims and remand them to the trial court. Otherwise, we affirm the judgment in all respects as to Wohlstein's remaining claims.