**Affirmed and Memorandum Opinion filed July 1, 2014.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-13-01106-CV

---

## TEXAS KIDNEY, INC. D/B/A SOUTHEAST HOUSTON DIALYSIS CENTER, AHMED RABIE, SANA RABIE, AND NADER RABIE, Appellants

### V.

### ASD SPECIALTY HEALTHCARE, Appellee

---

**On Appeal from the 113th District Court
Harris County, Texas
Trial Court Cause No. 2011-61844**

---

## M E M O R A N D U M   O P I N I O N

At issue in this appeal is the propriety of a temporary injunction prohibiting a shareholder of a corporation and his wife from disposing of certain personal assets purchased with corporate funds in transactions that allegedly constituted fraudulent transfers. We conclude that the trial court did not abuse its discretion in determining that the plaintiff, a creditor of the corporation, pleaded a claim against the defendants, and showed both a probable right to relief on that claim and a

probable, imminent, and irreparable injury in the interim before trial of the claim. Accordingly, we affirm the judgment of the trial court.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The appellants/defendants are Texas Kidney, Inc. d/b/a Southeast Houston Dialysis Center, its two shareholders Ahmed Rabie and his son Nader Rabie, and Ahmed's wife, Sana Rabie (hereinafter collectively "the Rabie Parties"). Texas Kidney, which was incorporated in April 2002, did business as the Southeast Houston Dialysis Center and provided services to community patients. In October 2004, Texas Kidney applied for and obtained credit from American Medical Distributors to purchase pharmaceuticals and supplies for use in its dialysis center. Texas Kidney then purchased supplies through American Medical Distributors as part of the Dialysis Purchasing Alliance, a group that purchased pharmceuticals together to obtain wholesale prices. In 2007, Ahmed and Nadar took over management of Texas Kidney. The following year, appellee/plaintiff ASD Specialty Healthcare acquired American Medical Distributors and became Texas Kidney's supplier. The Dialysis Purchasing Alliance also merged with another purchasing alliance around the same time. In the wake of the changes, there were some instances of ASD Specialty Healthcare overcharging Texas Kidney for pharmaceuticals. ASD Specialty Healthcare cleared those invoices and rebilled Texas Kidney for those charges.

Texas Kidney continued purchasing pharmaceuticals from ASD Specialty Healthcare throughout 2009 and the beginning of 2010. Texas Kidney did not pay several invoices. In January 2010, Texas Kidney sold the Southeast Houston Dialysis Center for the price of $3 million. As Texas Kidney received funds from the sale, it issued various checks to Nader Rabie, Ahmed Rabie, and other family members and friends. Ahmed Rabie used some of these funds to purchase real

2

property at 4314 Breakwood Drive ("Breakwood Property"). Texas Kidney corporate funds were used to purchase a $500,000 certificate of deposit payable to Ahmed Rabie and Sana Rabie.

In October 2011, ASD Specialty Healthcare filed suit in the trial court against Texas Kidney to collect the balance and applicable late charges on its invoices and applicable late charges for pharmaceuticals supplied between the fall of 2009 and April 2010. In its Third Amended Petition, which is the live petition in the case, ASD Specialty Healthcare asserted claims for (1) breach of contract, (2) sworn account, (3) quantum meruit, (4) money had and received, (5) fraud, (6) conversion, and (7) fraudulent transfer. In addition, ASD Specialty Healthcare asserts a claim based on the trust-fund doctrine. ASD Specialty Healthcare also asserted various theories for piercing the corporate veil between Texas Kidney and its shareholders Nader Rabie and Ahmed Rabie.

ASD Specialty Healthcare applied for a temporary injunction. At the temporary-injunction hearing, ASD Specialty Healthcare presented the testimony of its collections supervisor, Joshua Choate, and testimony from Nader Rabie and Ahmed Rabie. Choate testified that Texas Kidney owed ASD Specialty Healthcare a principal balance of $405,909.13 and late fees totaling $276,834.97. ASD Specialty Healthcare provided copies of invoices for pharmaceuticals and shipping company returns showing that the pharmaceuticals were delivered to Texas Kidney. Nader Rabie testified that Texas Kidney disputed the amount owed to ASD Specialty Healthcare.

After the hearing, the trial court issued a temporary injunction, enjoining Ahmed Rabie and Sana Rabie from selling, assigning, encumbering, or otherwise disposing of any interest in the Breakwood Property and from pledging, encumbering, withdrawing funds from or otherwise disbursing the balance in the

3

certificate of deposit. The trial court also authorized ASD Specialty Healthcare to file a notice of lis pendens in the real property records of Harris County regarding the Breakwood Property.

The Rabie Parties timely appealed, challenging the propriety of the temporary injunction.

## II.    STANDARD OF REVIEW

A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter until trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). At the temporary-injunction hearing, the applicant is not required to establish that it will prevail on final trial. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). To obtain a temporary injunction, a party must plead a claim against the defendant, and show both a probable right to recover relief on that claim and a probable, imminent, and irreparable injury in the interim. *See Butnaru*, 84 S.W.3d at 204; *Ryals v. Ogden*, No. 14-07-01008-CV, 2009 WL 2589429, at *2 (Tex. App.—Houston [14th Dist.] Aug. 25, 2009, no pet.) (mem. op.).

The decision to grant or deny a temporary injunction is within the sound discretion of the trial court, and the court's grant or denial is subject to reversal only for an abuse of discretion. *Butnaru*, 84 S.W.3d at 204. In reviewing the trial court's ruling on a request for temporary injunction, this court must not substitute its judgment for the judgment of the trial court, and this court may not reverse the trial court's order unless its decision was so arbitrary that it exceeded the bounds of reasonable discretion. *See id*. A trial court does not abuse its discretion by granting a temporary injunction if some evidence supports its decision. *See Ryals*, 2009 WL 2589429, at *2; *Sharma v. Vinmar Intern., Ltd.*, 231 S.W.3d 405, 419 (Tex. App.—Houston [14th Dist.] 200, no pet.). In reviewing the trial court's

4

exercise of discretion, the appellate court must draw all legitimate inferences from the evidence in the light most favorable to the trial court's order granting the temporary injunction. *See Ryals*, 2009 WL 2589429, at *2; *Sharma*, 231 S.W.3d at 419.

## III.  ISSUES AND ANALYSIS

In their sole appellate issue, the Rabie Parties assert that the trial court abused its discretion in imposing a temporary injunction affecting the assets of Ahmed Rabie and Sana Rabie.

### A.  Did the trial court abuse its discretion in determining that ASD Specialty Healthcare proved a probable right to recovery?

The Rabie Parties argue that ASD Specialty Healthcare is not entitled to a temporary injunction because it did not demonstrate that it had a probable right to recovery against Texas Kidney. In particular, the Rabie Parties assert that ASD Specialty Healthcare did not prove Texas Kidney owed the money ASD Specialty Healthcare demanded.

To prevail on a breach-of-contract claim, a plaintiff must prove (1) the existence of a valid contract; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach; and (4) the plaintiff's damages resulting from the breach. *Comiskey v. FH Partners, LLC*, 373 S.W.3d 620, 632 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). ASD Specialty Healthcare presented evidence at the hearing that it had a contract with Texas Kidney for the purchase of pharmaceuticals, that the pharmaceuticals were delivered, and that Texas Kidney did not pay for the pharmaceuticals. ASD Specialty Healthcare testified that Texas Kidney owed $405,909.13 on the principal balance and $276,834.97 in late fees.

5

Nader Rabie testified that Texas Kidney disputed the amount owed. He also stated that Texas Kidney was supposed to be charged the wholesale price minus 1.5%. He testified that he had begun conducting an audit of the bills, had discovered several pricing concerns, and that he could not complete his audit without obtaining a pricing list from ASD Specialty Healthcare. According to Nader, without such a list, he could not figure the wholesale price necessary to determine whether Texas Kidney was properly charged. Nader also testified that ASD Specialty Healthcare charged Texas Kidney the Medicare allowable rate for the pharmaceuticals, which he believed was a problem because he thought Texas Kidney should be charged less than the Medicare allowable rate. But, there was no evidence at the temporary-injunction hearing of any contracts or other written instruments indicating that Texas Kidney was to be charged less than the Medicare allowable rate. Neither was there any proof that Texas Kidney was being charged more than the wholesale price minus 1.5%. Choate testified that ASD Specialty Healthcare charged Texas Kidney the wholesale price minus 1.5%.

The record does not contain any evidence that Texas Kidney was not charged the appropriate rate for the pharmaceuticals. Because ASD Specialty Healthcare provided evidence of its contract with Texas Kidney, its performance under the contract, Texas Kidney's breach of contract, and the resulting damages, it was within the trial court's discretion to determine that ASD Specialty Healthcare had a probable right to recover on its breach-of-contract claim against Texas Kidney. *See Comiskey*, 373 S.W.3d at 632.

**B. Did the trial court abuse its discretion in determining that ASD Specialty Healthcare proved a probable right to recovery on its fraudulent-transfer claims?**

ASD Specialty Healthcare asserted that Texas Kidney fraudulently transferred money to the Rabies and that ASD Specialty Healthcare had a right to

recover that money from them. ASD Specialty Healthcare alleged several theories of fraudulent transfer, including that the transfers from Texas Kidney to Ahmed Rabie constituted actual fraud.

The purpose of the Texas Uniform Fraudulent Transfer Act (the "Act") is to "prevent fraudulent transfers of property by a debtor who intends to defraud creditors by placing assets beyond their reach." *Kaufmann v. Morales*, 93 S.W.3d 650, 653 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (internal quotations omitted) (quoting *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.] 2002, no pet.)). To accomplish that end, the Act permits a creditor, under certain circumstances, to set aside a debtor's fraudulent transfer of assets. *See* Tex. Bus. & Com. Code Ann. § 24.008(a) (West 2009); *Wohlstein v. Aliezer*, 321 S.W.3d 765, 776 (Tex. App.—Houston [14th Dist.] 2010, no pet.). A transfer is fraudulent as to present and future creditors if it is made "with actual intent to hinder, delay, or defraud any creditor of the debtor." Tex. Bus. & Comm. Code Ann. § 24.005(a)(1) (West 2014). *See Kaufmann*, 93 S.W.3d at 653. Direct proof of fraudulent intent is often unavailable, but circumstantial evidence may be used to prove fraudulent intent. *See Walker v. Anderson*, 232 S.W.3d 899, 914 (Tex. App.—Dallas 2007, no pet.). Section 24.005(b) of the Act sets out a non-exhaustive list of facts and circumstances, which are known as "the badges of fraud," to be considered in determining whether a transfer was made with actual intent to defraud. *See* Tex. Bus. & Com. Code Ann. § 24.005(b). An individual badge of fraud is not conclusive, but a concurrence of many badges in the same case will make out a strong case of fraud. *Walker*, 232 S.W.3d at 914.

The following are badges of fraud:
> (1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tex. Bus. & Com. Code Ann. § 24.005(b). For purposes of the first badge of fraud, that the transfer or obligation was to an "insider," an "insider" includes, among others, directors and officers of the debtor as well as relatives of the directors or officers of the debtor. *See* Tex. Bus. & Com. Code § 24.002(7) (West 2014).

At the temporary-injunction hearing, Ahmed and Nader testified regarding several payments, totaling over a million dollars, made by Texas Kidney to relatives or close friends of the Rabie family with funds obtained from selling the dialysis center. The following testimony was presented at the hearing:

- Texas Kidney sold the dialysis center for $3 million, receiving two payments of $500,000 in March and April of 2010, a payment of $230,761.41 in September 2010, and another deposit in November 2010.

- On May 6, 2010, Texas Kidney issued a cashier's check for $200,000 to

8

A&K Custom Homes. Nader stated that Texas Kidney had no loans or investments with A&K Custom Homes that would legitimize that payment. Ahmed initially stated that the check was an investment in A&K Custom Homes by Texas Kidney, but then admitted the check had been used in purchasing the Breakwood Property.

- A separate check was issued to A&K Custom Homes from Texas Kidney for $50,000. Nader and Ahmed both claimed this payment was an investment in A&K Custom Homes. Ahmed admitted that he had no documentation of the investment and that the investment is worthless today, but he stated that he had filed suit against A&K Custom Homes regarding the investment.

- On May 17, 2010, Texas Kidney issued a cashier's check to Ahmed for $668,632.17. Ahmed admitted that he used this check in purchasing the Breakwood Property. Nader testified that the check was issued as repayment for money Ahmed had loaned the company. Nader testified that Ahmed had loaned the company money with the understanding that the company would reimburse him when it was financially sound. According to Nader, there was no written evidence of the loan and the terms of repayment were that the officers would determine how to repay the loan. Nader testified that he did not know how the $668,632.17 payment was applied to the loan debt that Texas Kidney owed Ahmed and that it was "none of [his] business." Nader testified that it was up to Ahmed how to apply the payment to the loan.

- Ahmed testified that in May 2010, Texas Kidney issued a $450,000 cashier's check to an individual named Willie Svabic, who had loaned money to Texas Kidney.

- In December 2010, Texas Kidney purchased a $25,000 certificate of deposit payable to Nader's sister, and Ahmed's daughter, Naveen Rabie. Nader testified that Naveen Rabie was an attorney who performed work for Texas Kidney. Texas Kidney had no employment agreement or invoices from Naveen Rabie.

- In December 2010, Texas Kidney purchased an $18,000 certificate of deposit payable to Albina Rabie. Nader testified that Albina had provided Texas Kidney with marketing services; however, he was inconsistent in his testimony as to whether Albina also had loaned the company money. There was no documentation of any loan or employment.

9

- Nader testified that, in December 2010, Texas Kidney issued a check for $200,000 to the United States Treasury to discharge the tax liability of a person who had loaned money to Texas Kidney, as a means of repaying the loan. But, Nader could not remember the name of the person who allegedly made this loan to Texas Kidney.

- Nader testified that periodic distributions to himself from Texas Kidney in $4000, $5000, and $8000 increments constituted salary disbursements and loan repayments. Nader produced no W2 tax forms or other tax documents showing he was entitled to any salary from Texas Kidney during the time the payments were issued.

- In July 2011, Texas Kidney issued a check for $47,917.92 to Lone Star Ventures. Nader testified that this check was a repayment of a loan. He explained that Texas Kidney could not obtain financing from banks so it had to obtain monies through loans obtained by other corporations and the Rabies. Ahmed owns Lone Star Ventures.

- On September 26, 2011, approximately two weeks after receiving a formal demand letter from ASD Specialty Healthcare, Texas Kidney purchased a $500,000 certificate of deposit payable to Ahmed and Sana Rabie. Nader testified that this transaction was a repayment for loans. At a deposition two days before the hearing, Ahmed stated that the current value of the certificate of deposit was zero. At the hearing, he thought it may have contained "165, I think, or 168, something like that." In June 2013, Ahmed redeemed $135,000 from the certificate of deposit and invested it in Sana Investments, which is a company owned by Ahmed, his wife, Ahmed's children, and his father and mother. Sana Investments invests in real estate.

- Nader testified generally that some of the checks written to Ahmed were for loan repayment, and he did not know the reason for issuing others.

- Nader testified that loan documentation may have been lost when Texas Kidney moved the location of its facilities.

The testimony from Nader and Ahmed establishes that Texas Kidney made several inappropriate transfers of corporate assets. At issue in this appeal are the transfers of money to Ahmed, which he admitted he used to purchase the Breakwood Property, and the certificate of deposit purchased for Ahmed and Sana Rabie. Those transfers bear several badges of fraud. *See* Tex. Bus. & Com. Code

Ann. § 24.005(b). First, the transfers to Ahmed and Sana were made to insiders. *See* Tex. Bus. & Com. Code §§ 24.002, 24.005(b)(1). Second, Ahmed retained control of the transferred funds. *See* Tex. Bus. & Com. Code § 24.005(b)(2). He admitted that he used $668,632.71 to purchase the Breakwood Property and the trial court could have concluded that the $200,000 cashier's check from Texas Kidney to A&K Custom Homes also helped in purchasing the Breakwood Property, which is owned by Ahmed. Ahmed also had access to the certificate of deposit purchased for Ahmed and his wife. Third, Texas Kidney was threatened with suit before transferring the money. *See id*. at §24.005(b)(4). Texas Kidney was informed that its debt would be sent to collections before it transferred the money used to purchase the Breakwood Property. And, Texas Kidney purchased the certificate of deposit shortly after receiving a formal demand from ASD Specialty Healthcare. Fourth, the evidence showed that, at the time of the temporary-injunction hearing, Texas Kidney had transferred substantially all of its assets. *See id*. at § 24.005(b)(5). Because the Rabie Parties' actions bore several indicia of fraud, we conclude that the trial court did not abuse its discretion in determining that ASD Specialty Healthcare had a probable right to recover relief on its fraudulent-transfer claims. *See Walker*, 232 S.W.3d at 915.

C. **Did the trial court abuse its discretion in determining that ASD Specialty Healthcare proved a probable, imminent, and irreparable injury in the interim?**

The Rabie Parties argue that ASD Specialty Healthcare did not establish a probable, imminent, irreparable injury because there was no evidence they sought to harm ASD Specialty Healthcare or place assets beyond its reach. They also argue that (1) ASD Specialty Healthcare's delay in bringing the lawsuit should preclude a finding of irreparable harm, (2) ASD Specialty Healthcare's failure to join two individuals who signed a guarantee should preclude a finding of

11

irreparable harm, (3) ASD Specialty Healthcare did not prove a lack of an adequate remedy at law, and (4) allowing a lis pendens is inappropriate because ASD Specialty Healthcare had no direct interest in the Breakwood Property.

### 1. Irreparable harm

To obtain a temporary injunction, a party must prove a probable, imminent, and irreparable injury in the interim before trial. *See Butnaru*, 84 S.W.3d at 204; *Ryals*2009 WL 2589429, at *2. An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *See Butnaru*, 84 S.W.3d at 204. An existing remedy is adequate if it is as complete, practical, and just as equitable relief. *See Blackthorne v. Bellush*, 61 S.W.3d 439, 444 (Tex. App.—San Antonio 2001, no pet.).

The evidence shows that if the Rabie Parties are permitted to transfer their interest out of their homestead and the certificate of deposit, where Texas Kidney's assets allegedly have been fraudulently transferred and traced, ASD Specialty Healthcare will not be able to collect its claim against Texas Kidney or obtain effective relief on its fraudulent-transfer claims. Accordingly, the trial court did not abuse its discretion in determining that ASD Specialty Healthcare established a probable, imminent, and irreparable injury in the interim. *See id.*

### 2. Laches Defense

The Rabie Parties argue that ASD Specialty Healthcare's delay in bringing the lawsuit constitutes laches and that ASD Specialty Healthcare should not be entitled to any equitable relief. The Rabie Parties assert that they reasonably assumed their commercial disputes with ASD Specialty Healthcare were put to rest.

To prevail on a defense of laches, the Rabie Parties must prove that (1) ASD Specialty Healthcare unreasonably delayed in asserting its rights; and (2) the Rabie Parties made a good-faith change in position to their detriment because of the delay. *See Caldwell v. Barnes*, 975 S.W.2d 535, 538 (Tex. 1998); *Moon Sun Kang v. Derrick*, No. 14-13-00086-CV, 2014 WL 2048424, at *5 (Tex. App.—Houston [14th Dist.] May 15, 2014, no pet. h.). As soon as ASD Specialty Healthcare learned that Texas Kidney had sold its dialysis center, it began communicating with the Rabie Parties in an effort to obtain payment for the substantial amount owed by Texas Kidney. Texas Kidney repeatedly informed ASD Specialty Healthcare that it could not pay its bills until it finished conducting an audit. Texas Kidney never finished conducting the audit, and ASD Specialty Healthcare brought suit to recover the monies.

On appeal, the Rabie Parties argue that they changed their position because they paid money to their employees, lenders, and shareholders in reliance on the delay and "reasonably moved on with their lives." In these circumstances, the trial court reasonably could have determined that Texas Kidney could not have reasonably assumed that ASD Specialty Healthcare was no longer interested in collecting the debt (or that ASD Specialty Healthcare had abandoned or relinquished its right to the monies) and that the Rabie Parties did not make a good faith change in position as a result of any delay. *See Caldwell*, 975 S.W.2d at 538. We conclude that the trial court did not abuse its discretion by failing to find laches.

### 3. Possibility of recovery against other guarantors

The Rabie Parties argue that ASD Specialty Healthcare has a potential remedy against two guarantors that were joined in the suit and that because ASD Specialty Healthcare has that potential remedy against other guarantors, there is no

irreparable harm. Presuming for the sake of argument that ASD Specialty Healthcare does have a remedy against other guarantors and could collect on the judgment from them, ASD Specialty Healthcare also has a right to recover the debt from the principal obligor, Texas Kidney. *See* Civ. Prac. & Rem. Code Ann. § 17.001(a) (West 2008); *Cox v. Lerman*, 949 S.W.2d 527, 530 (Tex. App.—Houston [14th Dist.] 1997, no pet.). And, ASD Specialty Healthcare will be unable to collect if Texas Kidney is judgment-proof and ASD Specialty Healthcare is unable to obtain effective relief on its fraudulent-transfer claims. *See Blackthorne*, 61 S.W.3d at 444.

### 4. ASD Specialty Healthcare's interest in the Breakwood Property

The Rabie Parties argue that ASD Specialty Healthcare should not be entitled to a lis pendens on Nader and Sana's real property because a lis pendens is inappropriate where a party is seeking to secure payment of a judgment unrelated to the real property.

The lis pendens statute gives litigants a method to constructively notify anyone taking an interest in real property that litigation is pending against the property. *Young v. Galveston Black House Reality, Inc.*, No.14-08-0698, 2010 WL 2784339, at *4 (Tex. App.—Houston [14th Dist.] 2010, no pet.). A notice of lis pendens may be filed during the pendency of an action involving, among other things, the establishment of an interest in real property. Tex. Prop. Code Ann. § 12.007(a) (Vernon Supp. 2009); *Young*, 2010 WL 2784339, at *4. ASD Specialty Healthcare has asserted that Texas Kidney fraudulently transferred funds into the Breakwood Property in order to avoid paying its debt to ASD Specialty Healthcare. Texas Kidney, therefore, has asserted an interest in the Breakwood Property.

In support of their argument that Texas Kidney has not established an interest in the Breakwood Property, the Rabie Parties cite *Moss v. Tennant*, 722

14

S.W.2d 762, 763 (Tex. App.—Houston [14th Dist.] 1986, no pet.) (orig. proceeding). *Moss* was a mandamus proceeding in which the plaintiffs in the underlying lawsuit had purchased a home from the defendants, who had moved and used the proceeds of the sale to purchase another home. *Id.* at 762. The plaintiffs sued the defendants for various claims related to the sale of the house they purchased and sought to file a lis pendens against the defendants' new home. *Id.* at 762–63. The *Moss* court determined that the lis pendens against the new home was void because the plaintiffs did not have an interest in the new home except as security for the recovery of other damages. *Id.* at 763. Unlike ASD Specialty Healthcare, the plaintiffs in *Moss* did not bring any allegations of fraudulent transfer that would establish their interest in the new home.

Because ASD Specialty Healthcare has asserted an interest in the property subject to the lis pendens, the trial court did not err in allowing ASD Specialty Healthcare to file a lis pendens against the property. *See Young*, 2010 WL 2784339, at *4.

## IV.   CONCLUSION

The trial court did not abuse its discretion by concluding that ASD Specialty Healthcare pleaded a claim against the Rabie Parties , and showed both a probable right to recover relief and a probable, imminent, and irreparable injury in the interim before trial. Accordingly, the trial court did not err in granting a temporary injunction. The Rabie Parties' sole issue is overruled.

The trial court's temporary-injunction order is affirmed.

/s/     Kem Thompson Frost
Chief Justice

Panel consists of Chief Justice Frost and Justices Brown and Wise.

15