**Affirmed in Part and Reversed and Remanded in Part and Majority and Concurring and Dissenting Opinions filed April 12, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-10-01001-CV

---

### GUS H. COMISKEY, III, A/K/A TREY COMISKEY, AND TC3, INC., Appellants

### V.

### FH PARTNERS, LLC, Appellee

---

**On Appeal from the 113th District Court
Harris County, Texas
Trial Court Cause No. 2008-60397**

---

## M A J O R I T Y   O P I N I O N

This appeal follows the trial court's directed verdict and entry of a declaratory judgment that FH Partners did not breach its contract with Gus H. Comiskey, III a/k/a Trey Comiskey. The crux of the dispute between the parties is FH Partners' enforcement of the cross-collateralization clause in a loan agreement. Although Comiskey was not originally a party to the agreement, he signed an Extension and Modification of the agreement along with the original debtor. After the original debtor defaulted on other loans, FH Partners used the cross-collateralization clause to foreclose on property that the debtor had deeded to Comiskey's company, TC3, Inc. In six issues, appellants, Comiskey and TC3, contend (1) they presented more than a scintilla of evidence

supporting various theories of waiver, estoppel, and mutual mistake that bar FH Partners from enforcing the cross-collateralization clause, (2) the trial court erred in excluding testimony regarding the purpose of the agreement Comiskey signed, (3) they presented more than a scintilla of evidence that FH Partners committed fraud, (4) the court erred in determining that the loan documents unambiguously permit enforcement of the cross-collaterization clause, (5) the court erred in refusing to take into consideration the fair market value of foreclosed property in determining the merit of certain counterclaims, and (6) the court erred in its award of attorney's fees because FH Partners failed to segregate recoverable from unrecoverable fees.

We reverse the trial court's grant of a directed verdict on appellants' waiver claim and, consequently, the award of attorney's fees to FH Partners. We affirm the remainder of the judgment.

## I. Background

The connection between Comiskey and FH Partners runs through Paul Gomberg, who was a debtor to FH Partners and a business associate of Comiskey. By May 2008, Gomberg had several loans with 1st Choice Bank, a predecessor in interest to FH Partners. One of the transactions involved a purchase money loan for $1.365 million to purchase real property on Drury Street in Houston, Texas, and the other was a purchase money loan of $900,000 for property in an area known as "Burkhart Forest." In association with both of these notes, Gomberg executed deeds of trust to pledge the respective properties as collateral. These deeds of trust also contained cross-collateralization or "dragnet" clauses that made each property security for all of Gomberg's indebtedness to the beneficiary of the deeds of trust (at the time, 1st Choice).[1]

---

[1] For example, the deed of trust for the Burkhart property includes language stating as follows:

**This conveyance is made** in trust . . . **for the purpose of securing and enforcing** the payment of a certain promissory note . . . executed by Grantor [Gomberg] and payable to the order of 1ST CHOICE BANK, (hereinafter, together with any subsequent holder of the Note, called "Beneficiary"[)] . . . all renewals, rearrangements, extensions and/or modifications of the Note; and all other sums of money which may be hereafter paid or

Gomberg used the Burkhart loan to buy the Burkhart property from GHC3 Development, a corporation owned by Comiskey. The purchase price was $1.2 million; Gomberg paid $900,000 from proceeds of the 1st Choice loan and gave GHC3 a promissory note for the remainder. The promissory note also was secured by a second lien on the Burkhart property. Apparently, Gomberg intended to sell the Burkhart property to a local developer, but when that sale fell through and it appeared that Gomberg would be unable to make payment on the promissory note, Gomberg executed a deed in lieu of foreclosure, conveying the Burkhart property to TC3, a separate corporation wholly owned by Comiskey. That transaction, however, did not extinguish the debt owed to 1st Choice or 1st Choice's first lien on the Burkhart property.

On February 19, 2008, Gomberg and Comiskey went to 1st Choice's offices where both signed an "Extension and Modification" of the Burkhart note. This Extension and Modification, and the circumstances surrounding its execution, are the focus of the present litigation.

The Burkhart note was originally scheduled to mature on January 18, 2008. Under the terms of the Extension and Modification, Gomberg and Comiskey promised to pay the principal amount of the note ($900,000) plus 8% interest. The interest was due in six monthly payments beginning February 18, 2008, and the principal balance was due at maturity on July 18, 2008. FH Partners contends that it incorporated and maintained in full force the Burkhart deed of trust with its cross-collateralization, or "dragnet," clause, and appellants contend that it extinguished the clause. A key dispute between the parties

---

advanced by or on behalf of Beneficiary under the terms and provisions of this Deed of Trust; **any additional loans made by Beneficiary to Grantors**; and any and all other indebtedness, obligations and liabilities of any kind of Grantors to Beneficiary, now or hereafter existing, absolute or contingent, joint and/or several, secured or unsecured, due or not due, arising by operation of law, including indebtedness, obligations and liabilities to Beneficiary of Grantors as a member of any partnership, syndicate, association or other group, and whether incurred by Grantors as principal, surety, endorser, guarantor, accommodation party or otherwise, and whether originally contracted with Beneficiary or acquired by Beneficiary pursuant to a loan participation agreement or otherwise (all of which are hereinafter referred to as the "Indebtedness"). (Emphasis added.)

revolves around interpretation of the following paragraph in the Extension and Modification:

> And the Undersigned [Gomberg and Comiskey] hereby extends said liens on said property until said indebtedness and note as so renewed, modified and extended has been fully paid, and agreed that such extension or rearrangement shall in no manner affect or impair said note or the liens securing the same and that said liens shall not in any manner be waived, the purpose of this instrument being simply to extend or rearrange the time or manner of payment of said notes and indebtedness and to carry forward all liens securing the same, which are acknowledged by the Undersigned to be valid and subsisting, and the Undersigned further agree that all terms and provisions of said original note and of the instrument or instruments creating or fixing the liens securing the same shall be and remain in full force and effect as therein written, except as otherwise expressly provided herein.

The parties' arguments regarding this paragraph will be discussed in detail below.

Bill Sellers, a senior vice president of 1st Choice, signed the Extension and Modification on behalf of 1st Choice. There is no dispute that Comiskey signed the Extension and Modification; however, at trial, there was conflicting testimony regarding the circumstances under which Comiskey signed the agreement. Comiskey testified that he asked 1st Choice's representative, Sellers, about the Burkhart note itself but it was not produced at the meeting. According to Comiskey, Sellers represented that "the key terms of what would be our relationship going forward were in that three-page document [the Extension and Modification]." Comiskey said that the terms he was interested in were the interest rate and term of the loan. Comiskey had previously requested a copy of the Burkhart note from Gomberg, but Gomberg had failed to comply with Burkhart's request. Later in his testimony, Comiskey stated it was his understanding that if he paid off the note, title to the Burkhart property would be released to him. He said that he came to this conclusion in part because of discussions he had with Sellers. When asked what Sellers

4

said to make him think this, defense counsel objected on hearsay grounds and the trial court sustained the objection.[2]

In the offer of proof, Comiskey's attorney indicated that, had he been permitted to answer the question, Comiskey would have explained that Sellers told him the Extension and Modification was the only document he needed to review and full payment of the note would result in a full release of 1st Choice's lien on the property. Further according to the attorney, Comiskey would have testified that Sellers made these statements both before and after the Extension and Modification was signed. However, Comiskey also acknowledged in his trial testimony that he did not read all of the Extension and Modification or any of the Burkhart note or deed of trust, which were referenced in the Extension and Modification.

Sellers and Gomberg both testified that contact between Sellers and Comiskey was limited and no representations were made about any other documents. Gomberg, however, acknowledged that he was not in Comiskey's presence the entire time on the day in question when they were at 1st Choice.[3]

Comiskey subdivided the Burkhart property into several lots and began selling individual lots. When the first two lots sold, 1st Choice granted partial releases of its lien on those particular parcels and the majority of sale proceeds was allocated to reduce the balance on the Burkhart note.[4] On May 23, 2008, all of Gomberg's 1st Choice debt, including the Burkhart and Drury notes, was purchased by FH Partners. As the date of the debt sale approached, Comiskey contacted AllegianceBank about the possibility of obtaining another loan to pay off the Burkhart note. Allegiance requested the current balance from 1st Choice, and 1st Choice responded with a payoff quote addressed to

---

[2] In their second issue, appellants specifically complain about the court's sustaining of this objection.

[3] Gomberg stated that he stepped away from Comiskey for a brief period of time to transact other business at the bank. There is no indication in the record that Gomberg left Comiskey with Sellers or that Sellers and Comiskey had any contact outside of Gomberg's presence on the day in question.

[4] The Burkhart deed of trust specifically authorized the granting of partial releases "without affecting the lien hereof against the remainder."

Gomberg, which included the following language: "PLEASE FURNISH RELEASE OF LIEN." Sellers testified that such language typically indicated a bank was expecting to release a lien once the indicated amount was paid. Comiskey never obtained the loan from Allegiance.

After FH Partners purchased the notes, Jeff Coupe, a senior vice president for First City Servicing Corp., which managed Gomberg's notes for FH Partners, communicated with Comiskey about paying off the Burkhart note. When Comiskey sold another subdivided lot in the Burkhart property, FH Partners issued a partial release of its lien to facilitate the sale. At some point, an apparent discrepancy arose regarding the balance on the Burkhart note when Comiskey gave Gomberg a check to pay on the note, but the funds were misapplied. In the midst of this complication, Comiskey requested a statement and Coupe responded that the balance was $87,174.53.

In late April 2008, Gomberg went into default on his purchase money loan for the Drury property. Evidence reflects that he was cooperative through that summer in trying to pay the loan, but in August 2008, negotiations between Gomberg and First City (as FH Partners' representative) broke down, and FH Partners decided to foreclose on the Drury property. In that same month, Comiskey again requested a payoff amount on the Burkhart property, and First City informed him that the Burkhart property was subject to cross-collateralization obligations for debt on which Gomberg was then in default and that these other obligations would have to be satisfied before the lien on the Burkhart property could be released. Comiskey apparently attempted to pay the remaining balance on the Burkhart note but FH Partners rejected the payment. FH Partners then foreclosed on the last remaining subdivided lot from the Burkhart property.

Thereafter, FH Partners brought a declaratory judgment action to establish that it had not breached the contract between the parties. Comiskey then raised numerous defenses and counterclaims, including variations of waiver, estoppel, fraud, breach of

6

contract, mutual mistake, and unjust enrichment.[5]  After presentation of the evidence but before the jury was charged, the trial court granted a directed verdict in favor of FH Partners.  The court then entered a declaratory judgment that FH Partners did not breach the contract between the parties.  Appellants now bring this appeal.

We begin our analysis by addressing appellants' evidentiary complaints under issue two.  We will then consider the breach-of-an-unambiguous-contract contention raised in issue four, the mutual mistake, estoppel, and waiver claims raised in issue one, and the fraud claim raised in issue three.  Lastly, we will consider the fair market value contention raised in issue five and the attorney's fees complaint raised in issue six.

## II.  Standard of Review

Appellants primarily seek reversal of the trial court's granting of a directed verdict favoring FH Partners.  We review the grant of a directed verdict under the usual standards for assessing the legal sufficiency of the evidence.  *See City of Keller v. Wilson*, 168 S.W.3d 802, 821–28 (Tex. 2005).  We examine the evidence in the light most favorable to the party against whom the verdict was directed, and we determine whether there is any evidence of probative value to raise a material fact issue on the question presented. *See Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 684 (Tex. 2004).  We credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not.  *See City of Keller*, 168 S.W.3d at 827.

## III.  Evidentiary Complaints

We first address appellants' challenges to evidentiary rulings made by the trial court to determine whether we can appropriately consider certain evidence in analyzing appellants' substantive contentions.  Under issue two, appellants specifically complain about exclusion of (1) Comiskey's testimony that Sellers told him that full payment of the Burkhart note would result in full release of the Burkhart lien, and (2) Sellers's testimony

---

[5] Appellants initially raised claims against Gomberg and other entities as third-party defendants, but those claims were nonsuited or otherwise disposed of prior to trial.  Appellants also raised other counterclaims against FH Partners that are not raised as grounds for reversal in this appeal.

that "the deal" was that if the note were paid in full, the lien would be released. To preserve error in the exclusion of evidence, a party must (1) attempt during the evidentiary portion of the trial to introduce the evidence; (2) if an objection is lodged, specify the purpose for which the evidence is offered and give the trial court reasons why the evidence is admissible; (3) obtain a ruling from the court; and (4) if the court rules the evidence inadmissible, make a record of the evidence the party desires admitted. *E.g., Tex. Prop. and Cas. Guar. Ass'n v. Nat'l Am. Ins. Co.*, 208 S.W.3d 523, 546 (Tex. App.–Austin 2006, pet. denied).

We review a trial court's evidentiary rulings under an abuse of discretion standard. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). A trial court abuses its discretion when it acts without regard to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985); *Mitchell v. Bank of Am., N.A.*, 156 S.W.3d 622, 626 (Tex. App.—Dallas 2004, pet. denied). Unless an erroneous evidentiary ruling probably caused rendition of an improper judgment, this court will not overturn the trial court's ruling. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000).

## A. Sellers's Alleged Representations

We turn first to the excluded testimony from Comiskey regarding alleged representations by Sellers. During direct examination, Comiskey's counsel asked him why he thought that if he paid off the Burkhart note the lien would be released. Comiskey answered, in part, that his belief was based on "[d]iscussions . . . with Mr. Sellers." Counsel next asked, "What did Mr. Sellers say that made you think this was the deal?" Opposing counsel then raised a hearsay objection, which the trial court sustained. In response, appellant's counsel pointed out that the question and expected answer went to Comiskey's state of mind when he acted in reliance on the statement. Counsel also explained that the statement was relevant to the intent of the parties in making the agreement and was not offered for the truth of the matter asserted. Later, counsel submitted an offer of proof, indicating Comiskey would have testified that Sellers stated,

8

both before and after the signing of the Extension and Modification, that full payment of the note would result in full release of the lien.

On appeal, appellants argue that the proffered testimony concerned "operative facts" and therefore was not offered for the truth of the matter asserted in Sellers's alleged statements; in other words, the testimony was admissible as evidence that Sellers made the statements, regardless of whether the statements were true. *See* 2 Steven Goode et al., *Texas Practice Series: Guide to the Texas Rules of Evidence* § 801.2 (3d ed. 2002) (discussing nonhearsay utterances including "operative facts"). For example, in proving elements of estoppel, testimony that a promise was made would not be hearsay because relevance of the testimony is not dependent on the truth of the statement but on the fact that it was made. *See Allen v. Allen*, 280 S.W.3d 366 (Tex. App.—Amarillo 2008, pet. denied); *cf. Thomas C. Cook, Inc. v. Rowhanian*, 774 S.W.2d 679, 685 (Tex. App.—El Paso 1989, writ denied) (explaining that statements constituting offer, acceptance, or terms of a contract concern operative facts and are therefore not barred by the hearsay rule); *Cherokee Water Co. v. Forderhause*, 727 S.W.2d 605, 614 (Tex. App.—Texarkana) (finding statements of operative facts admissible in context of mutual mistake claim), *rev'd on other grounds*, 741 S.W.2d 377 (Tex. 1987). Because Comiskey's testimony was offered as proof that Sellers made certain statements, and not to establish the truth of the matter asserted in the statements themselves, we agree that the proffered testimony was not hearsay. We hold the trial court abused its discretion by excluding it. Accordingly, we will consider the excluded testimony where appropriate in our substantive analysis but reverse only if the evidentiary error was harmful. *See Caffe Ribs, Inc. v. State*, 328 S.W.3d 919, 927, 931 (Tex. App.—Houston [14th Dist.] 2010, no pet.).[6]

---

[6] As will be explained in detail below, the excluded testimony was an integral part of the evidence establishing a fact question regarding appellants' waiver claims. Consequently, we reverse the trial court's directed verdict against those claims.

## B. Sellers's Testimony

Next, we consider the proffered testimony regarding Sellers's purported belief that "the deal" required release of the lien upon full payment of the note. On appeal, appellants complain about two rulings made by the court below, specifically the sustaining of both a "legal conclusion" objection and a "speculation" objection during cross-examination of Sellers concerning Sellers's understanding of the Extension and Modification agreement.[7] Appellants' counsel asked Sellers, based on specific language in the agreement, "until when" were the liens to be extended? Opposing counsel objected on the ground that the question called for a legal conclusion (*i.e.*, interpretation of the particular language in the agreement), and the trial court sustained the objection. Because the question objected to was tied to the interpretation of a specific phrase in the contract, the trial court did not abuse its discretion in excluding the testimony.[8] Appellants' counsel then abandoned that line of questioning.

Later, appellants' counsel asked Sellers "if Mr. Comiskey had tendered full payment of that note at that time, would the bank have released this lien?" Opposing counsel objected that the question called for "speculation," and the trial court sustained the objection. Because this particular question asked what 1st Choice would have done in a particular situation, rather than what Sellers would have done or recommended, the trial court did not abuse its discretion in sustaining the objection. Furthermore, appellant did not offer any specific argument to the trial court, nor does so in its appellate brief, as to the propriety of the question at issue and whether it improperly called for speculation. *See* Tex R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made . . . .").[9] Because appellant has not demonstrated that the trial court

---

[7] The trial court actually permitted much of this line of questioning over various objections by opposing counsel.

[8] Appellants submitted an excerpt from Sellers's deposition as an offer of proof of what Sellers would have said had the trial court not excluded the evidence.

[9] Although not mentioned by appellants in their briefing, counsel did ask one additional time regarding Sellers's understanding of the agreement between the parties. Appellants' counsel asked, "In this time frame, sir, you understood that full payment of this note, the first lien note, would result in a full

committed any error in excluding Sellers's testimony, we will not consider the proffered testimony in our substantive analysis below.

## IV. Breach of Unambiguous Contract

In their fourth issue, appellants challenge the trial court's finding that as a matter of law, FH Partners did not breach the parties' unambiguous agreement. Appellants contend the loan documents are ambiguous and that the interpretation of them, therefore, should have been a matter for the jury. *See Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983) (explaining that when a contract contains an ambiguity, its interpretation becomes a fact issue). According to appellants, the jury could have reasonably interpreted the ambiguous agreement in their favor—as requiring FH Partners to release the Burkhart lien upon full payment of the $900,000 plus interest due on the Burkhart note. Because FH Partners clearly rejected Comiskey's tendered final payment and refused to release the lien, if the jury adopted appellant's suggested interpretation, FH Partners would have breached the contract. In granting the directed verdict, the trial court found that the agreement between the parties unambiguously included a cross-collateralization clause under which the Burkhart property also secured other debts owed by Gomberg to FH Partners.

To prevail on a breach of contract claim, a plaintiff must prove (1) the existence of a valid contract; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach; and (4) the plaintiff's damages resulting from the breach. *Roof Sys. Inc. v. Johns Manville Corp.*, 130 S.W.3d 430 (Tex. App.—Houston [14th Dist.] 2004, no pet.). The interpretation or construction of an unambiguous contract is a matter of law to be determined by the court. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). Whether a contract is ambiguous is also a question of law for the court.

---

release of this lien; is that accurate?" Opposing counsel objected, "He's already said the documents control. And this is just going over the same—." The trial court then cut off opposing counsel by sustaining his objection. Appellants' counsel offered no response to the objection or defense of the question and moved on to questions concerning a document. The issue of whether the trial court erred in sustaining this objection is not preserved or presented for our review.

*J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).  If a contract can be given a certain or definite legal meaning or interpretation, it is not ambiguous.  *Coker*, 650 S.W.2d at 391.  Ambiguity does not arise simply because parties advance conflicting interpretations of a contract.  *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 728 (Tex. 2001).

When interpreting a contract, our primary concern is to ascertain and give effect to the intent of the parties as expressed in the agreement.  *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006).  To discern this intent, we examine and consider the entire writing in an effort to harmonize and give effect to all of its provisions so that none will be rendered meaningless.  *Id.*  No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument.  *Id.*

Appellants focus exclusively on language in the Extension and Modification.  FH Partners contends that it incorporated and maintained in full force the Burkhart deed of trust with its cross-collateralization, or "dragnet," clause, and appellants contend that it extinguished the clause.  Appellants first note that the only indebtedness expressly mentioned in the Extension and Modification is the $900,000 owed on the loan for the Burkhart property.  They then point to the following operative statement:  "Undersigned hereby extends said liens on said property until said indebtedness and note as so renewed, modified and extended has been fully paid."  Appellants contend that the provision for only a $900,000 debt in the Extension and Modification in fact modified the amount required to be paid for a release of the lien, thus nullifying the cross-collateralization clause contained in the deed of trust.  According to appellants, since the only indebtedness mentioned in the Extension and Modification itself was on the Burkhart property, the reference to "indebtedness and note" in the operative statement must refer to that and only that debt.

We agree with FH Partners' and the trial court's interpretation of the contract, however, and disagree with appellants that there was any ambiguity requiring

12

interpretation by the jury. The Extension and Modification explains that "the purpose of this instrument [is] simply to extend or rearrange the time or manner of payment of said notes and indebtedness and to carry forward all liens securing the same . . . ." It further specifically references the Burkhart note and deed of trust and states that their terms "remain in full force and effect . . . except as otherwise provided" in the Extension and Modification.

The Extension and Modification does not expressly reference, much less extinguish, the cross-collateralization clause in the deed of trust.[10] Appellants' recitation of somewhat imprecise language in the Extension and Modification regarding "indebtedness" and "liens" does not convince us that there is any indication that the parties intended to nullify the cross-collateralization clause, particularly in light of the language that the terms of the deed of trust were to remain in effect and the sole purpose of the Extension and Modification was to extend the time of payment and carry forward the liens. Accordingly, the trial court did not err in ruling that the agreement between the parties unambiguously permitted enforcement of the cross-collateralization clause. We overrule appellants' fourth issue.

## V. Mutual Mistake & Reformation

In their first issue, appellants contend, among other things discussed below, that the evidence presented questions for the jury regarding whether there was a mutual mistake between the parties necessitating reformation of the contract and whether FH Partners breached the reformed contract. The underlying objective of reformation is to correct a mutual mistake made in preparing a written instrument, so that the instrument truly reflects the original agreement of the parties. *Cherokee Water*, 741 S.W.2d at 379. Thus, a party seeking reformation of a contract based on mutual mistake must prove: (1) an original agreement and (2) a mutual mistake, occurring after the original agreement, in reducing the original agreement to writing. *See id.* The mistake in reducing the original

---

[10] Interestingly, in his trial testimony, Comiskey acknowledged that through the cross-collateralization clause in the deed of trust, Gomberg's other debts were secured by the Burkhart property.

agreement to writing must be by both parties. *Valero Energy Corp. v. Teco Pipeline Co.*, 2 S.W.3d 576, 589 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *United Interests, Inc. v. Brewington, Inc.*, 729 S.W.2d 897, 903 (Tex. App.-Houston [14th Dist.] 1987, writ ref'd n.r.e.); *see also Estes v. Republic Nat'l Bank of Dallas*, 462 S.W.2d 273, 275 (Tex. 1970) (stating that it is not enough that an agreement existed that was at variance with the writing; the proponent must go further and "establish the fact that the terms or provisions of the writing which differ from the true agreement made were placed in the instrument by mutual mistake"). "A court is without power to make a contract that the parties did not make; an actual agreement reached prior to the drafting of the instrument involved is a prerequisite to an action for reformation." *Cherokee Water*, 741 S.W.2d at 379. It is also important to note that "[t]he doctrine of mutual mistake must not routinely be available to avoid the result of an unhappy bargain." *Williams v. Glash*, 789 S.W.2d 261, 265 (Tex. 1990).

As evidence of mutual mistake, appellants point primarily to Comiskey's proposed testimony that Sellers told him that paying off the Burkhart note would result in release of the Burkhart lien. Based on this evidence, appellants suggest that Comiskey and 1st Choice both understood that this was the agreement. However, under the circumstances of this case, these alleged statements by Sellers do not establish that an agreement was reached between Comiskey and 1st Choice prior to the reduction of the agreement into writing. Comiskey testified that he arrived at 1st Choice on the day the agreement was signed expecting to receive a new and separate note of his own, replacing the one Gomberg already had with 1st Choice. He was then given the Extension and Modification to sign, which had already been drafted before Comiskey and Gomberg arrived at 1st Choice. Comiskey testified that Sellers told him that the Extension and Modification was the only document he needed to review, and in his excluded testimony, Comiskey would have stated that Sellers told him what "the deal" was between the parties. Sellers denied making these representations to Comiskey. However, even assuming, as we must, that Sellers made those representations, they were representations

14

about a document that already had been drafted but not yet signed; the statements did not constitute contract negotiations or a meeting of the minds.[11] Therefore, they are no evidence of mutual mistake. *See Cherokee Water*, 741 S.W.2d at 379 (explaining that mutual mistake concerns an actual agreement reached prior to the *drafting* of the written instrument).[12]

Furthermore, the circumstances in this case are substantially similar to those the Texas Supreme Court addressed in *Estes*, 462 S.W.2d 273. In that case, the court held that in the absence of a showing of "fraud or imposition," mutual mistake cannot occur where one party did not even read the agreement before signing. *Id.* at 276. In other words, the court reasoned that when one party does not read the contract, there cannot be a mutual mistake in drafting the agreement absent fraud or duress. *See id.* Appellants do not allege any form of duress or imposition.

The fraud exception referenced by the *Estes* court is often called "unilateral mistake." *See, e.g., Orix Capital Mkts., LLC v. La Villita Motor Inns, J.V.*, 329 S.W.3d 30, 46 (Tex. App.—San Antonio 2010, pet. denied); *see also Cambridge Cos. v. Williams*, 602 S.W.2d 306, 308 (Tex. App.—Texarkana 1980) (explaining unilateral mistake) (cited in *Davis v. Grammer*, 750 S.W.2d 766, 769 (Tex. 1988)), *aff'd*, 615 S.W.2d 172 (Tex. 1981). In their briefing, appellants allege that the evidence presents a fact question as to whether there was a unilateral mistake on Comiskey's part caused by fraud on the part of 1st Choice and FH Partners. Appellants do not cite, however, where they raised this counterclaim or defense below, and our review has not revealed any

---

[11] Sellers's alleged representations also encompassed the deed of trust and note which preexisted, and were incorporated into, the Extension and Modification.

[12] In *Cherokee Water*, the court explained that there could be no mutual mistake where the document in question was drafted before any alleged agreement occurred because the mistake must be in the *drafting* of the agreement. 741 S.W.2d at 381. The court further clarified that the time of drafting is the key and not the time of execution. *Id.* at 380.

Appellants additionally point to conduct by 1st Choice, and later FH Partners, which occurred well after the Extension and Modification was signed, as evidence that both sides had a different understanding of what their agreement was than that contained in the written contract. This is also no evidence that an agreement was reached prior to the drafting and signing of the Extension and Modification.

preservation of this issue in the trial court. Accordingly, they cannot rely on this claim on appeal. *See Orix Capital*, 329 S.W.3d at 46; *Loera v. Interstate Inv. Corp.*, 93 S.W.3d 224, 228 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). We overrule appellants' first issue to the extent it contends the trial court erred in not submitting the issue of reformation to the jury.

## VI.  Estoppel

Also in their first issue, appellants assert that the trial court erred in refusing to submit their promissory estoppel, equitable estoppel, and quasi-estoppel counterclaims and defenses to the jury. Specifically, appellants contend they presented a fact question regarding whether FH Partners was precluded, under these doctrines, from enforcing the cross-collateralization clause in the Burkhart deed of trust. We will address each of these doctrines separately because their respective elements differ significantly.

### A.  Promissory Estoppel

Promissory estoppel is an equitable doctrine that ordinarily is used defensively to prevent "a party from insisting upon [its] strict legal rights when it would be unjust to allow [it] to enforce them." *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex. 1985). It requires evidence of (1) a promise, (2) foreseeability of reliance, (3) actual, substantial, and reasonable reliance by the promisee to his or her detriment, and (4) that failure to enforce the promise would result in an injustice. *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 133 (Tex. 2005); *Collins v. Walker*, 341 S.W.3d 570, 573–74 (Tex. App.—Houston [14th Dist.] 2011, no pet.). To support a finding of promissory estoppel, the asserted "promise" must be sufficiently specific and definite that it would be reasonable and justified for the promisee to rely upon it as a commitment to future action. *See Alpha Vista, Inc. v. Holt*, 987 S.W.2d 138, 141–42 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). The "promise" also must be more than mere speculation concerning future events, a statement of hope, or an expression of opinion, expectation, or assumption. *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 305 (Tex. App.—Dallas 2009, no pet.).

Appellants support their promissory estoppel claim by pointing to (1) Sellers's alleged statements that "the deal" between the parties was that full payment of the Burkhart note would result in release of the Burkhart lien; (2) the payoff quote provided by 1st Choice to Gomberg, which included the statement "please furnish release of lien"; and (3) FH Partners' providing of an account balance without stating that Gomberg had other outstanding debts.[13] Assuming without deciding that the evidence cited is proof of promises directly contradicting the terms of the agreement between the parties, there is no evidence that Comiskey reasonably relied on these promises. *See Collins*, 341 S.W.3d at 573–74.

A party to an arm's length transaction must exercise reasonable diligence in protecting his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party. *Ortiz v. Collins*, 203 S.W.3d 414, 422 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *see also Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962) (fraud case). Appellants provide few arguments regarding Comiskey's reliance or the reasonableness thereof. Instead, they essentially rely on the inference that because promises allegedly were made and Comiskey sold lots and paid the proceeds to the successive owners of the Burkhart note, he must therefore have relied on the promises in doing so.[14]

The record reflects that Comiskey is a sophisticated businessman with significant experience negotiating commercial contracts as well as real estate transactions and bank loans. *See 1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 30 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (explaining that the question

---

[13] The balance in question was provided in email form and in response to an email request from Comiskey asking specifically for "the outstanding balance on this note." As discussed above, the email exchange was apparently in relation to a possible discrepancy in the loan balance. No specific payoff figure was requested or given.

[14] At no point in his testimony was Comiskey specifically asked about his alleged reliance on promises outside the written contract. At one point, he testified that he relied upon the Extension and Modification agreement to protect his second lien in preference to the cross-collateralization of the property for Gomberg's other debts. This interpretation of the written agreement, however, has not been mentioned in the appellate briefing.

17

of justifiable reliance often depends heavily on the relative sophistication of the parties); *see also BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 68–69 (Tex. 2011) (considering sophistication of party in holding alleged reliance was not reasonable as a matter of law).[15] He admitted that he did not fully read the Extension and Modification. Had he read it, he would have learned that, as discussed above, it referenced the note and deed of trust and indicated that terms in those documents still governed the loan. Had he then read the deed of trust before signing the Extension and Modification, he would have seen the cross-collateralization clause.[16] Comiskey complained at trial that 1st Choice did not provide him with copies of the deed of trust or the note; however, it is also clear from the evidence that (1) Comiskey was under no duress to sign the Extension and Modification without having read the deed of trust; (2) Comiskey did not refuse to sign without first seeing the deed of trust; (3) Comiskey also failed to obtain a copy of the document from Gomberg, the other signatory; and (4) the deed of trust was filed in the public property records and thus available to Comiskey to view on his own.[17]

In summary, Comiskey was a relatively sophisticated person who by his own admission signed on to an existing loan without fully reading the Extension and Modification he was signing or even seeing the underlying and still largely controlling loan documents. In doing so, Comiskey did not act with reasonable diligence to protect his own interests. *See Swank v. Sverdlin*, 121 S.W.3d 785, 802 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (holding that party, who failed to read contracts, could not

---

[15] Comiskey testified that he has a degree in finance, has negotiated commercial contracts as a professional energy consultant, and has been involved in several prior real estate investments, each of which involved lenders.

[16] Comiskey averred that had he read the cross-collateralization clause, he would not have understood it. *But see R. Conrad Moore & Assocs., Inc. v. Lerma*, 946 S.W.2d 90, 94 (Tex. App.—El Paso 1997, writ denied) ("A person who signs a contract is presumed to know and understand its contents; absent a finding of fraud, failure to apprehend the rights and obligations under the contract will not excuse performance."). He further acknowledged that he should have consulted an attorney regarding the transaction but did not.

[17] Furthermore, Comiskey acknowledged in his own testimony at trial that he sold the third lot and paid the proceeds to FH Partners because he was "obligated to do so" under the Extension and Modification agreement. He did not specifically say that he paid on the note based on any promises made outside and contradictory to the signed agreement.

justifiably rely on alleged misrepresentations contrary to the terms of the contracts). Consequently, appellants have not raised a fact question on the element of reasonable reliance. Accordingly, the trial court did not err in directing a verdict against appellants' promissory estoppel claims.

## B. Equitable Estoppel

Under the doctrine of equitable estoppel, a party is precluded, due to its voluntary conduct, from asserting rights it might otherwise possess against another person who has relied on the party's conduct to change his position for the worse. *Royalco Oil & Gas Corp. v. Stockhome Trading Corp.*, No. 02-10-00455-CV, 2012 WL 254037, at *5 (Tex. App.—Fort Worth 2012, no pet. h.). It requires evidence of (1) a false representation or concealment of material facts, (2) made with actual or constructive knowledge of those facts, (3) with the intention that it should be acted on, (4) to a party without knowledge, or the means of knowledge, of those facts, (5) who detrimentally relied upon the misrepresentation. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex. 1998).

In support of their equitable estoppel claim, appellants contend that 1st Choice and FH Partners knew the facts concerning the cross-collateralization clause and Gomberg's other debts but concealed them from Comiskey and instead represented that payment of the Burkhart debt would result in release of the Burkhart lien. They further state that having made representations about "the transaction and his debt," 1st Choice and FH Partners had a duty to "tell him the full story and disclose the dragnet clause." As for reliance, appellants again appear to rely on the inference that because Comiskey paid on the Burkhart note, he must have done so in reliance on the representations by 1st Choice and FH Partners.

Appellants arguments, however, principally ignore the requirement that the party urging application of the equitable estoppel doctrine have been without the means of obtaining knowledge of the true facts. *See Johnson & Higgins*, 962 S.W.2d at 515–16. Although Comiskey testified that neither Gomberg nor 1st Choice provided him with a

19

copy of the deed of trust where the cross-collateralization clause could be found, he acknowledged that he did not insist on seeing a copy before signing the Extension and Modification, and the record also reflects that the deed of trust was on file in the public property records prior to the Extension and Modification being signed. Appellants suggest that Sellers kept appellant from obtaining knowledge of the "true facts" by suggesting Comiskey did not need to review any other documents. Although this alleged statement may have discouraged Comiskey from viewing the deed of trust before signing, it did not prevent him from doing so.[18] Because Comiskey clearly had the means of knowledge regarding the existence of the cross-collateralization clause, the trial court did not err in directing a verdict against appellants' equitable estoppel claim. *Simpson v. MBank Dallas, N.A.*, 724 S.W.2d 102, 108 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (affirming summary judgment where party claiming estoppel presented no evidence that he was without means of knowledge concerning either the financial status of parties whose loan he guaranteed or the effect of his guaranty).[19]

---

[18] It is unclear to what extent appellants are contending that 1st Choice or FH Partners should have informed Comiskey regarding Gomberg's financial status. However, at the time Comiskey signed the Extension and Modification, he knew that Gomberg had defaulted on payment of the promissory note to Comiskey himself. Furthermore, as FH Partners points out, Comiskey entered the bank with Gomberg to sign onto one of Gomberg's loans. Appellants provide no argument as to why under those circumstances, 1st Choice had a duty to inform Comiskey of Gomberg's financial status.

[19] In *Simpson*, similar to here, the party claiming estoppel admitted that he did not attempt to ascertain the financial status of the parties whose loan he guaranteed but instead relied on the advice of another. 724 S.W.2d at 108. Also in *Simpson*, the court explained that the claimant possessed the means to know the effect of his guarantee, in part, because he had signed prior similar guarantees with the same lender. *Id.*

In support of their arguments, appellants cite *Alamo Bank of Texas v. Palacios*, 804 S.W.2d 291 (Tex. App.—Corpus Christi 1991, no writ), and *Monumental Life Insurance Co. v. Hayes-Jenkins*, 403 F.3d 304 (5th Cir. 2005). Both are distinguishable from the present case. In *Alamo Bank*, the Corpus Christi Court of Appeals upheld a trial court's estoppel finding where there was evidence that a bank representative promised that the bank would not press criminal charges for forgery against a third party if Palacios signed a promissory note in favor of the bank. 804 S.W.2d at 295. However, at the time the promise was made, the bank already had reported the alleged forgery to the FBI. *Id.* There is no discussion in the opinion of whether Palacios had means of knowledge regarding the charges. *Id.*

In *Monumental Life*, the Fifth Circuit held that an issue of material fact was raised precluding summary judgment where evidence suggested that insurance application instructions contained potentially misleading statements on which a couple may have reasonably relied. 403 F.3d at 311–13. Again, there

20

## C. Quasi-Estoppel

Quasi-estoppel precludes a party from asserting, to another party's disadvantage, a right inconsistent with a position previously taken; it applies only when it would be unconscionable to allow the party to maintain the inconsistent position. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). Unlike equitable estoppel, quasi-estoppel requires no showing of misrepresentation or detrimental reliance. *Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*, 176 S.W.3d 80, 87 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

Appellants' argument is essentially that, with 1st Choice and FH Partners having made representations, committed acts, and remained silent for months while Comiskey gradually paid off the Burkhart note under the belief that doing so would result in a full release of the Burkhart lien, FH Partners could not then assert the cross-collateralization clause and refuse to accept Comiskey's final Burkhart payment and release the lien. As stated, in order to constitute quasi-estoppel, 1st Choice and FH Partners' conduct had to have been unconscionable. *See, e.g., Doe v. Tex. Ass'n of Sch. Bds., Inc.*, 283 S.W.3d 451, 464 (Tex. App.—Fort Worth 2009, pet. denied) (holding party who obtained money under a settlement agreement was estopped from contending that she did not have authority to provide the required consideration); *Eckland Consultants*, 176 S.W.3d at 81–83, 87–88 (holding that property inspector was estopped from claiming that a plaintiff did not have standing to sue for a breach of the inspection contract when the company accepted the benefits of the contract and stated in a report that noncontracting entities could rely on the report). The actions appellants complain of, even if true, were not unconscionable under the circumstances of this case.

As discussed above, none of 1st Choice's or FH Partners' statements or conduct directly contradicted the cross-collateralization clause or promised that it would not be enforced in the event of a default and subsequent lack of cooperation from Gomberg.

---

is no discussion in the opinion regarding whether the couple had the means of knowledge regarding the true contents of the insurance policy, which they only received after their application was accepted. *Id*.

Thus, it was not unconscionable for FH Partners to enforce the cross-collateralization clause. *See Fasken Land & Minerals, Ltd. v. Occidental Permian Ltd.*, 225 S.W.3d 577, 594 (Tex. App.—El Paso 2005, pet. denied) (holding it was not unconscionable for party to exercise its right under a contract). Ultimately, it was Comiskey's own failure to read the loan documents that caused any alleged disadvantage he suffered in the transaction. *Cf. Douglas v. Moody Gardens, Inc.*, No. 14-07-00016-CV, 2007 WL 4442617 at *4 (Tex. App.—Houston Dec. 20, 2007, no pet.) (mem. op.) (rejecting quasi-estoppel claim and holding that workers' compensation claimant's failure to timely pursue claim, not employer's taking of inconsistent positions, was cause of denial of recovery). Comiskey made payments on the Burkhart note as he was required to do under the Extension and Modification agreement. FH Partners collected the benefits to which it was entitled under the agreement (payment of principal and interest) and enforced the cross-collateralization clause as it was entitled under the contract.[20] It was not unconscionable for FH Partners to accept benefits under the unambiguous contract. Consequently, the trial court did not err in directing a verdict against appellants' quasi-estoppel claim.

## VII. Waiver

Appellants additionally assert in their first issue that the trial court erred in granting a directed verdict because they presented more than a scintilla of evidence that FH Partners and its predecessor in interest, 1st Choice, waived the right to enforce the

---

[20] In *Hartford Fire Insurance Co. v. City of Mont Belvieu, Texas*, the Fifth Circuit explained that

"Rights expressly secured by contract" ordinarily cannot be "dissolve[d]" by quasi-estoppel because a party may, pursuant to a contract and for legitimate reasons, have the right to assert superficially inconsistent positions at different times. *Neiman-Marcus Group, Inc. v. Dworkin*, 919 F.2d 368, 371 (5th Cir. 1990); *Fasken Land & Minerals, Ltd. v. Occidental Permian Ltd.*, 225 S.W.3d 577, 594 (Tex. App.—El Paso 2005, petition denied) . . . . That party cannot "be equitably charged with choosing to accept benefits in a manner genuinely inconsistent with his subsequent claim." *Neiman-Marcus*, 919 F.2d at 371 (emphasis added). In such a case, the party has not acted to "avoid corresponding obligations" but merely to assert its legal rights. *Fasken*, 225 S.W.3d at 593.

611 F.3d 289, 298–99 (5th Cir. 2010) (first bracket omitted).

cross-collateralization clause.[21]  Waiver is the intentional relinquishment of a known, existing right or intentional conduct inconsistent with claiming it.  *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003).  The affirmative defense of waiver can be established by a party's express renunciation of a known right, by its conduct, or by silence or inaction for so long a period as to show an intention to yield the known right.  *See Aguiar v. Segal*, 167 S.W.3d 443, 451 (Tex. App.—Houston [14th Dist.] 2005, no pet.).  A person who does nothing inconsistent with an intent to rely upon a right does not waive that right.  *Jernigan*, 111 S.W.3d at 156.  Waiver is ordinarily a question of fact, but when the surrounding facts and circumstances are undisputed, the question becomes one of law.  *WTG Gas Processing, L.P. v. ConocoPhillips Co.*, 309 S.W.3d 635, 648 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).  We find that a fact issue existed regarding waiver, and thus, the trial court erred in directing a verdict against this claim.

As evidence of waiver, appellants point to (1) Comiskey's proffered testimony that Sellers told him both "before and after" they signed the Extension and Modification that full payment of the Burkhart note would result in full release of the Burkhart lien; (2) Sellers's allegedly discouraging Comiskey from viewing the Burkhart note and deed of trust by telling him that the Extension and Modification contained all of the key terms; (3) the issuance of partial releases by 1st Choice and FH Partners; (4) the pay-off statement from 1st Choice which included the phrase "please furnish release of lien"; (5) alleged conversations involving Jeff Coupe, as representative of FH Partners, with Comiskey and a representative of AllegianceBank, Dan Tralmer, who was attempting to set up a refinancing or buyout of the Burkhart note; and (6) 1st Choice and FH Partner's failure to inform Comiskey either that he would have to pay off Gomberg's other debts in order to get clear title to the Burkhart property or exactly what other debts Gomberg had. We will begin by addressing the evidence which will not support waiver; we will then examine the evidence that created a fact issue on waiver.

---

[21] Appellants explain in their briefing that their waiver claim was a defense to the declaratory judgment action and also supported their affirmative claims for unjust enrichment and breach of contract.

## A. Not Evidence of Waiver

Statements made and conduct occurring before signing the agreement could not constitute waiver of terms in the agreement. *See, e.g., Tri-Steel Structures, Inc. v. Baptist Found. of Tex.*, 166 S.W.3d 443, 451 (Tex. App.—Fort Worth 2005, pet. denied). Likewise, statements made contemporaneously with signing the agreement, and which purported to simply explain "the deal" that was being signed, would not constitute an express renunciation of a right contained in the document. Thus, Sellers's alleged statements at the time of signing the Extension and Modification, and his allegedly discouraging Comiskey from viewing the other loan documents, amount to no evidence of waiver.

Additionally, that 1st Choice and FH Partners had a practice of issuing partial releases when parcels of the Burkhart property were sold, taken in isolation, was no evidence of waiver. The deed of trust itself provided for the granting of partial releases "without affecting the lien hereof against the remainder." Furthermore, the partial releases did no more than facilitate sale of the parcels in order to pay down the debt[22]; thus, by themselves, the partial releases neither demonstrated a clear intent to waive the cross-collateralization clause nor were inconsistent with assertion of the clause when Comiskey attempted to pay the balance due on the Burkhart note and keep the final lot for himself.

Lastly, appellants do not explain on what basis they claim 1st Choice or FH Partners had a duty to inform Comiskey regarding the nature of Gomberg's other debts. *See generally* Tex. R. App. P. 38.1(i) (requiring briefs to contain argument for the contentions raised); *Brown v. Green*, 302 S.W.3d 1, 14 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (declining to expand on party's conclusory arguments). Comiskey entered the bank with Gomberg and signed the Extension and Modification as a co-maker on Gomberg's preexisting note. Appellants cite no authority for the proposition that 1st

---

[22] Evidence demonstrated that the vast majority of the proceeds from sale of the lots went to retire the debt and very little, if any, was retained by Comiskey.

24

Choice or FH Partners had a duty to inform Comiskey about Gomberg's other debts.[23] Without such a duty, the failure to disclose is no evidence that 1st Choice or FH Partners waived enforcement of the cross-collateralization clause.

### B. More than a Scintilla

In the offer of proof responsive to the court's exclusion of portions of Comiskey's testimony, appellants' counsel represented that Comiskey would have testified that at some point after the agreement was signed, Sellers told him full payment of the Burkhart note would result in full release of the Burkhart lien. Additionally, as mentioned, evidence was admitted regarding conversations between Coupe and Comiskey, and Coupe and Dan Tralmer, regarding a refinancing or buyout of the Burkhart note. These alleged statements and conversations, when taken together in light of the pay-off statement and the assertion that neither 1st Choice nor FH Partners ever mentioned the cross-collateralization clause to Comiskey or Tralmer as a roadblock to full release of the lien, presented a fact question on the waiver claim.[24] Of particular note, the pay-off statement in question included the phrase "please furnish release of lien." Sellers acknowledged that inclusion of such language on a pay-off statement typically indicated that a bank was expecting to release a lien once the specified amount was paid. This language, taken together with the alleged statements, conversations, and silence regarding the clause itself, presents at least some evidence of an intention to yield a known right.

---

[23] FH Partners suggests that informing Comiskey about Gomberg's debt would have run contrary to certain banking laws, citing Tex. Fin. Code § 59.006. We need take no position on whether this is correct under the circumstances of this case.

[24] Again, taken in isolation, the conversations between Coupe and Comiskey and Coupe and Tralmer are were not enough to raise a fact issue; it is only when considered together that the evidence creates a fact issue on waiver. Specifically concerning these conversations, the record shows that Coupe spoke to Comiskey about Comiskey's plans to sell off several lots, pay off the note, and then build a house on the final Burkhart lot. However, at no point in the testimony are any specific promises or waivers by Coupe mentioned. Coupe himself testified that he talked with Comiskey to try to figure out why Comiskey was involved with the loan because "[i]t just didn't seem to make much sense." Coupe said that he did not realize Comiskey expected a release if the note was fully paid. Similarly, the testimony regarding Coupe's discussions with Tralmer reveals, at most, negotiations regarding a possible refinancing or buyout of the Burkhart note, but the conversations never resulted in any such buyout, much less any express renunciation of the cross-collateralization clause.

*See Aguiar*, 167 S.W.3d at 451. It also is some evidence of conduct inconsistent with an intent to rely upon the right of cross-collateralization. *See Jernigan*, 111 S.W.3d at 156.

We sustain appellants' first issue to the extent appellants contend the trial court erred in directing a verdict against their waiver claims.[25] However, we overrule the first issue to the extent appellants allege the trial court erred by directing a verdict against their mutual mistake or estoppel contentions.

## VIII. Fraud

In their third issue, appellants contend there was evidence to support submission to the jury of their fraud, fraudulent concealment, and fraudulent inducement counterclaims against FH Partners. Under these counterclaims, appellants sought actual and exemplary damages against FH Partners. Fraud requires a showing of a material misrepresentation, which (1) was false, (2) was either known to be false when made or was asserted without knowledge of the truth, (3) was intended to be acted upon, (4) was relied upon, and (5) caused injury. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990). Silence when there is a duty to speak may equate to a misrepresentation of material facts. *Ho v. UT Arlington*, 984 S.W.2d 672, 691 (Tex. App.—Amarillo 1998, pet. denied) (explaining that a duty to speak may exist when the parties are in a fiduciary relationship or when a party later discovers that a material representation it made was untrue). To support a claim of fraud, reliance on a misrepresentation must be justifiable and reasonable. *See*

---

[25] In the trial court, FH Partners pleaded application of the statute of frauds in response to appellants' counterclaims; however, at no point in the trial court or on appeal has FH Partners contended that the application of the statute defeats appellants' waiver claim. Moreover, it does not appear that FH Partners established such a defense as a matter of law. For the statute in question, Texas Business and Commerce Code section 26.02, to apply, the financial institution must have given conspicuous notice to the debtor or obligor in a writing signed by the debtor or obligor. Tex. Bus. & Comm. Code § 26.02(e). The Extension and Modification signed by Comiskey did not include this required notice. Appellants also claimed that the subsequent waiver was evidenced by writings (the partial releases and payoff quote) and thus was not an oral modification barred by the statute of frauds, and that Comiskey partially performed based on the alleged waiver, which is an exception to the statute of frauds. *See Bank of Tex.*, *N.A. v. Gaubert*, 286 S.W.3d 546, 553-54 (Tex. App.—Dallas 2009, pet. dism'd w.o.j.) (discussing partial performance exception to statute of frauds).

*Atl. Lloyds Ins. Co. v. Butler*, 137 S.W.3d 199, 226 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (citing Restatement (Second) of Torts § 531 (1977)).

As evidence of fraud, Comiskey cites (1) Coupe's email stating the Burkhart note balance, (2) the partial release issued by FH Partners for the sale of a portion of the Burkhart property, and (3) FH Partners' failure to disclose Gomberg's other debts and the fact they were tied to release of the lien on the Burkhart property. According to Comiskey's version, FH Partners led him along, taking his payments on the Burkhart note, and then refused to accept final payment and release the lien.

In their briefing, appellants state that Coupe told Comiskey in an email that "the Burkhart note could be paid off for $87,174.53." The email in question, however, only responded to an email request from Comiskey for a balance amount on the Burkhart note; nothing was said by either party to the emails about a payoff of the note.[26] The record further reflects that the correspondence concerned an alleged discrepancy in the balance, apparently owing to the fact that Comiskey had given a check to Gomberg to take to the bank to pay on the note and some of the funds got misapplied. Corrections were made. The email contained no representation that if the amount was paid, a release of lien would issue; it merely provided the information Comiskey requested: the balance on the Burkhart note.

As for the partial release issued by FH Partners for one of the lots sold from the Burkhart property, there is no evidence that the statements therein are untrue. Standing alone, this document makes no material misrepresentations which could be a basis for a finding of fraud. It merely provided a partial release of lien, which was authorized under the deed of trust and was a prerequisite for sale of the lot. Appellants suggest, though,

---

[26] In an email dated June 6, 2008, Comiskey asked Coupe "What is the outstanding balance on this note per your records?" Coupe responded the same day with an email stating a principal balance, accrued interest, and total for the note. Coupe further said that he needed to confirm the accuracy of the figures because the "asset" had just been uploaded on the system. On June 13, after sale of one of the Burkhart lots, Comiskey again emailed Coupe: "Have you had a chance to review the balance on this yet? It was my belief we had a difference." Coupe responded three days later, providing an attachment showing payment and balance history for the note. He further stated "I am showing a current balance of $87,174.53."

27

that it "could [have] further[ed] Comiskey's preexisting belief that payment of the last sum remaining on the note would discharge the lien." However, assuming this allegation could be a basis for a fraud claim, appellants cite no evidence that FH Partners was aware that Comiskey had such a preexisting belief; appellants further cite no evidence that FH Partners intended for Comiskey to rely on the partial release in continuing to pay on the debt.

Lastly, appellants complain that FH Partners never disclosed that Gomberg's other loans were secured by the Burkhart property. But, as discussed above, appellants offer no basis for imposing a duty on FH Partners to supply that information. *See generally* Tex. R. App. P. 38.1(i); *Brown*, 302 S.W.3d at 14. Because the evidence cited by appellants does not raise a material issue of fact supporting their fraud counterclaim, we overrule their third issue.

## IX. Fair Market Value

In issue five, appellants contend that the trial court erred in entering a directed verdict against their breach of contract, fraud, and unjust enrichment counterclaims because there was evidence that FH Partners wrongfully refused to credit appellants with the fair market value of the Drury property. Gomberg owned the Drury property and defaulted on a balance of over $1.4 million owed to FH Partners for purchase of the property. FH Partners thereafter foreclosed on the Drury property and then credited the $850,000 sales price it paid for the property at foreclosure against the debts owed by Gomberg and secured by the cross-collateralization clause in the Burkhart deed of trust. Appellants contend, however, that there was evidence that the fair market value of the Drury property was closer to $1.5 million, which sum should have been credited against Gomberg's debts. According to appellants, if the fair market value had been credited against Gomberg's debts, there would have been no need to foreclose on the Burkhart property because there would not have been an outstanding balance on the Drury loan.

In support of their contention, appellants cite sections 51.003, 51.004, and 51.005 of the Texas Property Code. Tex. Prop. Code §§ 51.003–.005. These sections permit a

person obligated for indebtedness, and against whom a post-foreclosure deficiency is sought, to offset the fair market value of the property foreclosed upon against the amount owed if the fair market value is greater than the actual foreclosure proceeds. *Id*. Appellants acknowledge, however, that they were not makers or guarantors of the note on the Drury property and FH Partners did not seek to recover a foreclosure deficiency against them; thus, they cannot make a claim directly under those code sections.[27] Other than suggesting that this court apply the "spirit" of the Property Code to the facts of this case, appellants do not cite any authority or make any particular argument suggesting these code provisions can be used in this manner. We decline to apply the provisions beyond the boundaries set by the legislature. *See generally St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex. 1997) (explaining that courts must interpret statutes as written and are not themselves law-making bodies); *Consol. Reinforcement, L.P. v. Carothers Exec. Homes, Ltd.*, 271 S.W.3d 887, 892 (Tex. App.—Austin 2008, no pet.) ("It is not the function of this Court to expand the scope of [a statute] beyond the legislature's intent as expressed in the statute's plain language."). Accordingly, we overrule appellants' fifth issue.

## X. Conclusion

We reverse the trial court's grant of a directed verdict on appellants' waiver claim. Because we reverse on this substantive issue, we also reverse the award of attorney's fees favoring FH Partners and need not reach appellants' sixth issue complaining about FH Partners' failure to properly segregate its fees. *See Hamrick v. Ward*, No 14-10-00560-CV, 2011 WL 6975990, at *14 (Tex. App.—Houston [14th Dist.] December 29, 2011, no pet. h.). We further sever and remand those issues for further proceedings in the trial court.

---

[27] Gomberg and his wife were the only signatories on the Drury loan; Comiskey was a signatory on the Extension and Modification regarding the Burkhart property only.

The remainder of the judgment is affirmed.


/s/      Martha Hill Jamison
         Justice



Panel consists of Justices Seymore, Brown, and Jamison. (Brown, J., Concurring and Dissenting Opinion.)