**Opinion issued December 15, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00952-CV

———————————

**HERBERT JACKSON, Appellant**

**V.**

**PATRICIA JACKSON, Appellee**

---

**On Appeal from the 328th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 14-DCV-217167**

---

### MEMORANDUM OPINION

Herbert Jackson appeals the issuance of a protective order preventing him from having contact with his wife, Patricia Jackson. By two issues, Herbert asserts that the evidence was both legally and factually insufficient to support a finding of

family violence and that making such a finding was an abuse of discretion. We affirm.

## Background

On August 25, 2014, Patricia Jackson, acting pro se, applied for a protective order against her husband, Herbert. At the time of filing, Patricia and Herbert were living separately. Patricia previously sought and obtained a protective order against Herbert in 2011, but that protective order was no longer in effect. Patricia sought a new protective order on the grounds that (1) Herbert had committed family violence and is likely to commit family violence in the future and (2) Herbert violated the prior protective order. The trial court held a hearing on Patricia's application on September 23, 2014, at which the trial court considered the following facts contained in the sworn affidavit accompanying Patricia's application and Patricia and Herbert's oral testimony.

### A.    Recent allegations of family violence

The new allegations of family violence offered in support of Patricia's application involved incidents in May and August 2014. Patricia testified that Herbert had been abusive since the early days of their marriage, and though there have been stretches of time when Herbert has not been physically abusive, she testified that "eventually, it starts back again." According to Patricia, in May 2014, while waiting to board a plane, Herbert called her away from a conversation she

2

was having with another passenger and led her over to a gate area where no one was congregated. Once there, Herbert elbowed her in the side as she sat down, cursed at her, and threatened to "bust" her in her face. Patricia jumped up in pain, and Herbert demanded that she sit back down. Herbert repeatedly asked Patricia what she had talked to the other passenger about, refusing to accept her answer that it had just been a general conversation. Though Herbert had not been abusive since issuance of the 2011 protective order and their separation, after the May 2014 incident at the airport, Patricia testified that she felt Herbert's abusive behavior was starting all over again. Herbert denied threatening Patricia at the airport and denied intentionally elbowing her, saying that it was an accident. He admitted seeing her talking with another passenger and calling her away, but testified that he did so not out of jealousy, but rather because he felt that passenger was using Patricia to aggravate his traveling companion.

In August 2014, Patricia told Herbert she would be filing for divorce, and thereafter Patricia averred that Herbert started showing up often and unannounced. On Monday, August 18, 2014, at 3:30 a.m., Herbert showed up unannounced at Patricia's house. According to Patricia, she was afraid of possible confrontation as Herbert started asking where she had been the day before. Though Patricia explained that she had been at work, Herbert repeated the question several times, suggesting to Patricia that he did not believe she was being truthful. She was only

3

able to get him to leave her house after assuring him that she would come by his home during her lunch hour later that day.

After Patricia did not visit with Herbert during lunch, he called around 4:50 p.m., and Patricia explained that she was too busy to meet with him and was on the way to pick up her grandson. Herbert called again at 8:27 p.m. Patricia told Herbert that her grandson had gone home and that she was tired and on her way to bed. Patricia recounted that Herbert raised his voice in response, saying to Patricia that she must be crazy and rhetorically asking whether she thought he would allow her to continue treating him that way. When Patricia explained that she was tired after being woken up by him so early in the morning, Herbert first responded, "so what," but finally said he understood after Patricia again explained how tired she felt. According to Patricia, that conversation ended with Herbert saying "okay get some rest and I'll talk to you tomorrow."

Roughly 50 minutes later, at 9:17 p.m., Patricia's doorbell rang. Patricia went to the foyer and saw through the glass doors that Herbert was at her house again—his second uninvited appearance within less than 20 hours. Patricia testified that seeing Herbert at the door made her very scared; in light of how they ended their phone conversation, she was unsure what frame of mind would have brought him to her door. Though Herbert had a key to Patricia's house, he did not have a key to the exterior storm doors, and because the storm doors were locked,

4

Patricia believed he would not be able to get inside without her first opening the door. Patricia was so scared and nervous that she did not open the door. Instead, she called her daughter and asked her to call the police. Meanwhile, Herbert continued ringing the doorbell and then began knocking on Patricia's bedroom window and calling her cell phone. Rather than answering Herbert's calls, Patricia called her neighbor and asked her to call the police, too. Patricia left her bedroom and started up the stairs, intending to hide in the attic. Her daughter called Patricia's cell phone to say that the police were on the way and would be calling. The police called Patricia's land line, and Patricia was on the phone with them and her daughter when she heard Herbert's voice inside her house.

Before Patricia was able to hide in the attic, Herbert found her, and she hung up the call with the police. Without any acts of physical aggression, Herbert brought Patricia back downstairs and they sat together on the couch. The cell phone call between Patricia and her daughter was still open, but when Herbert saw the phone, he pressed "end call." Though Herbert seemed calm to Patricia, she hoped the police would hurry up. Patricia asked Herbert how he got into the house, but could not recall whether he answered. Instead, she remembered him saying that she could not keep him out of the house because his Texas driver's license bore her address. Herbert told Patricia that meant she "couldn't keep him out and he could come in." Patricia averred that she prayed the police would get

5

there as soon as possible. Police officers arrived at 9:30 p.m., roughly nine minutes after receiving the first call, and rang the doorbell. Herbert answered the door and complied when the officers asked him to step outside, return his set of keys to Patricia, and leave her property.

While admitting the series of events that occurred on August 18, 2014, Herbert maintains that there was nothing threatening or violent about his conduct. Herbert stressed to the trial court that he and Patricia had maintained an intimate relationship since their separation. Each had a key to the other's home, and when invited, would visit the other. On occasion, Herbert joined Patricia on vacations. In January 2014, Herbert briefly lived in Patricia's house while she was recovering from surgery. Patricia admitted their continuing relationship, explaining that she had felt better living apart from him because she was able to choose what she would and would not do with him. She reiterated that, in light of all the abuse that had transpired over the years, she was very frightened of Herbert.

## B. Previous allegations of family violence

Patricia's application further recounted instances of family violence dating back to August 2001, which had supported issuance of the 2011 protective order. According to her petition, in August 2001, days after their wedding, Herbert accused Patricia of stealing money the couple had received at their wedding, drove Patricia to a park, got out of the car, put gloves on and beat Patricia's arms and

6

torso with his fists. In April 2002, Herbert drove Patricia to a remote area off the highway, got out of the car, and opened the trunk. Upon finding a new blouse Patricia had bought in the trunk, Herbert put on gloves, took out a metal pipe, and proceeded to repeatedly hit Patricia's backside with the metal pipe. In July 2002, Herbert picked up a wooden tray and began swinging it at Patricia's daughter. When Patricia intervened, Herbert struck her in the head with the tray, inflicting an injury that required stitches. In January 2003, Herbert repeatedly struck Patricia's head after she mentioned to other members of her church that Herbert had forgotten that it was her birthday. In March 2003, Herbert did not believe Patricia when she told him she was just coming home from the doctor's office, so he threw Patricia on their bed and attempted to wrap duct tape around her head and mouth. In August 2003, Patricia did not tell Herbert that she was making a trip to Wal-Mart, and when she returned home, Herbert threw her onto their bed and started to beat her with both fists. In December 2003, Herbert struck Patricia in the face, giving her a black eye, after seeing her flat ironing her daughter's boyfriend's hair. In August 2004, Herbert threatened to strike Patricia with a baseball bat, but instead struck her with his hand, giving her another black eye. In August 2005, Herbert did not believe Patricia when she told him she ran by her office after church without telling him in advance, and so he kicked her, saying next time she would remember to tell him. In January 2008, Herbert and Patricia's son,

Nathaniel, had a disagreement about Nathaniel's mechanic. Herbert grabbed Nathaniel, and after he was unable to drag him out of the house, began to choke him. In May and June 2008, Herbert repeatedly kicked Patricia. In August 2008, Herbert struck Patricia's head, perforating her eardrum—an injury that would require two surgeries. In April 2009, Herbert struck Patricia and threatened that she would "end up bloody and in the hospital or dead." In September 2009, Herbert made threats against Nathaniel. In June 2010, Herbert threatened to strike Patricia with a wrench. In July 2010, Herbert cursed, pushed, kicked, and struck Patricia after she could not find a confirmation number for a package she mailed for him. In August 2010, upset that Patricia had not cleaned a window, Herbert grabbed Patricia in a choke hold, pushed her downward, and threatened to break her neck. In January 2011, Herbert repeatedly pushed Patricia while screaming at her. Patricia recalled being afraid that if she tried to fight back, Herbert would seriously hurt or even kill her.

## C.    2014 Protective Order

The trial court found that Herbert committed family violence against Patricia by breaking in to her home and is likely to commit family violence in the future and granted the protective order against Herbert, which expires by its own terms on September 23, 2016. The protective order prohibits Herbert from being within 200 yards of Patricia and prohibits communication between Herbert and Patricia.

8

It further requires that he refrain from acts intending or threatening physical harm, bodily injury, or assault; not stalk, follow or engage in conduct reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass; and not possess a firearm or ammunition. The trial court additionally required Herbert to enroll in a battering intervention and prevention program. Herbert timely appealed.

## Discussion

Herbert challenges the protective order on the grounds that (1) the evidence is legally and factually insufficient to make a finding of family violence and (2) the trial court abused its discretion in making a finding of family violence. Though framed as two independent points of error, we address Herbert's arguments together because each ultimately raises the same issue: whether there was sufficient evidence for the trial court to make a finding that family violence occurred in August 2014.

### A.    Standard of Review

Notwithstanding a split among Texas appellate courts, this Court reviews protective orders for legal and factual sufficiency, and we review Herbert's complaint accordingly.[1]  *See, e.g.*, *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000)

---

[1]    *Compare Coffman v. Melton*, 448 S.W.3d 68, 71 n.4 (Tex. App.—Houston [14th Dist.] 2014, pet. denied), *Clements v. Haskovec*, 251 S.W.3d 79, 84 (Tex. App.—Corpus Christi 2008, no pet.), *and McAfee v. Yancey*, No. 02–14–00192–CV, 2015 WL 1020856, at *3 n.9 (Tex. App.—Fort Worth March 5, 2015, no pet.) (mem. op.) (each acknowledging split among Texas

(explaining that, when the trial court acts as a fact-finder, appellate court reviews findings under the legal and factual sufficiency standards); *Boyd v. Palmore*, 425 S.W.3d 425, 429 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (reviewing protective order under legal and factual sufficiency standards).

When the party that did not have the burden of proof at trial challenges the legal sufficiency of the evidence, we must consider all of the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor and disregarding contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005); *City of Houston v. Hildebrandt*, 265 S.W.3d 22, 27 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). If more than a mere scintilla of evidence exists, it is legally sufficient and we will overrule that issue. *Lozano v. Lozano*, 52 S.W.3d 141, 145 (Tex. 2001); *Hildebrandt*, 265 S.W.3d at 27. There is more than a scintilla of evidence if the evidence rises to a level that would enable reasonable and fair-minded people to reach differing conclusions. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d

appellate courts and applying legal and factual sufficiency standards of review), *with In re Epperson*, 213 S.W.3d 541, 542–43 (Tex. App.—Texarkana 2007, no pet.) (reviewing protective order under the same standard applied to the grant or denial of permanent injunction: abuse of discretion) *and Culver v. Culver*, 360 S.W.3d 526 (Tex. App.—Texarkana 2011, no pet.) (applying abuse of discretion standard of review).

778, 782–83 (Tex. 2001); *Coffman v. Melton*, 448 S.W.3d 68, 71 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

In reviewing factual sufficiency, we examine the entire record in order to consider and weigh all the evidence, both in support of, and contrary to, the challenged finding. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Boyd*, 425 S.W.3d at 429. After considering and weighing all the evidence, we set aside the verdict only if the evidence is so weak, or the finding is so against the great weight and preponderance of the evidence, that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We cannot substitute our opinion for that of the trier of fact merely because we might reach a different conclusion. *Boyd*, 425 S.W.3d at 429. The trier of fact remains the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.* at 431.

## B.    Applicable Law

The Texas Family Code provides that a court shall enter a protective order if it finds that family violence (1) has occurred and (2) is likely to occur in the future. TEX. FAM. CODE ANN. §§ 81.001, 85.001 (West 2008). In relevant part, "family violence" is defined as:

> [A]n act by a member of a family . . . against another member of the family . . . that is intended to result in physical harm, bodily injury, assault, or sexual assault *or* that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself.

TEX. FAM. CODE ANN. § 71.004(1) (West 2008) (emphasis added). The legislative intent in passing Title IV was to "reduce the high incidence of deaths and injuries sustained by law enforcement officers in handling family disturbances and to aid law enforcement officers in protecting victims of family violence from serious or fatal injuries." Act of April 19, 1979, 66th Leg., R.S., ch. 98, § 1, 1979 Tex. Gen. Laws 182, 182 (repealed and reenacted 1997). "The purpose of the protective order statute is not to remedy past wrongs or punish prior criminal acts; rather, it seeks to protect the applicant and prevent future violence." *Roper v. Jolliffe*, --- S.W.3d ---, 2015 WL 5946680, at *7 (Tex. App.—Dallas Oct. 9, 2015, no pet. h.). Given the remedial nature of Title IV, courts should broadly construe its provisions in order to give effect to its humanitarian and preventative purposes. *Boyd*, 425 S.W.3d at 430 (citing *United Fire & Cas. Co. v. Boring & Tunneling Co. of Am.*, 321 S.W.3d 24, 28 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)).

**C.  Analysis**

The evidence, viewed in the light most favorable to the trial court's finding, shows that in August 2014, after continued unwelcome contact beginning in the early morning hours, Herbert went to Patricia's home without invitation and with the knowledge that she was tired, on her way to bed, and did not want to see him. After his doorbell ringing, window banging, and phone calls failed to bring Patricia to the door, he proceeded to break in to her home. Patricia testified that this caused

12

her considerable fear and prompted her to contact both her daughter and her neighbor so that they might call the police. The August 2014 incident, summoning of the police, and Patricia's testimony about her fearfulness provide legally sufficient evidence supporting the trial court's finding that Herbert committed "an act . . . that [was] a threat that reasonably placed [Patricia] in fear of imminent physical harm, bodily injury, [or] assault," thereby satisfying the definition of "family violence." *See* TEX. FAM. CODE ANN. § 71.004(1).

To support his contention that the August 2014 incident did not rise to the level of family violence, Herbert notes that there is no evidence that he struck or yelled at Patricia, threw things around the house, or expressly threatened her. Herbert also argues that the evidence is legally insufficient to support a finding of family violence because Patricia did not see, hear, or feel Herbert break in through the storm door and thus his breaking in through the storm door could not have placed Patricia in fear. In sum, Herbert appears to argue that, in the absence of evidence of some physically violent act or express threat, there can be no finding of family violence. We disagree.

In addition to acts intending physical harm, threats that reasonably place the victim in fear of imminent harm constitute family violence. *See, e.g.*, *Boyd*, 425 S.W.3d at 430–31 (concluding that appellant committed act of family violence when he blocked appellee's car with his body and jumped on hood of car);

*Clements v. Haskovec*, 251 S.W.3d 79, 85–86 (Tex. App.—Corpus Christi 2008, no pet.) (concluding that appellant committed act of family violence by raising his fist and making other threats though he never actually struck a family member); *Valenzuela v. Munoz*, No. 04–12–00660–CV, 2013 WL 4678682, at *3 n.1 (Tex. App.—San Antonio Aug. 28, 2013, no pet.) (mem. op.) (relying on evidence of other acts, but commenting that appellant's "SWAT-style" sweep of appellee's home or attempts to take their son while drunk might independently support family violence finding). Even in circumstances where no express threats are conveyed, the factfinder may nonetheless conclude that an individual was reasonably placed in fear. *Wilmeth v. State*, 808 S.W.2d 703, 706 (Tex. App.—Tyler 1991, no pet.) (noting that even without verbal threats, a reasonable person may be placed in fear by a menacing glance and hand gesture). Though physical violence did not transpire during the August 2014 incident, the record before the trial court chronicled over a decade of physical abuse. In light of that history of abuse and the escalation of Herbert's conduct within a 20 hour time frame, the trial court reasonably could have concluded that Patricia reasonably feared imminent bodily injury after Herbert broke into her home.

Contrary to Herbert's contention, that history of abuse is not too remote to support issuance of a protective order. *See Kuzbary v. Kuzbary*, No. 01–14–00457–CV, 2015 WL 1735493, at *5 (Tex. App.—Houston [1st Dist.]

14

April 14, 2015, no pet.) (mem. op.) (evidence supporting protective order included instances of physical aggression occurring two to four years before application for a protective order); *Dempsey v. Dempsey*, 227 S.W.3d 771, 778 (Tex. App.—El Paso 2005, no pet.) (evidence supporting protective order included actions by ex-husband five years before application for protective order). Courts have observed that "[o]ftentimes, past is prologue; therefore, past violent conduct can be competent evidence which is legally and factually sufficient to sustain the award of a protective order." *In re Epperson*, 213 S.W.3d 541, 544 (Tex. App.—Texarkana 2007, no pet.) (citing *In re T.L.S.*, 170 S.W.3d 164 (Tex. App.—Waco 2005, no pet.)). In light of Herbert and Patricia's particular history, and viewed in the light most favorable to the ruling, the escalation of his uninvited conduct within less than a 20 hour period, culminating in a trespassory entry into Patricia's home by breaking in through what she thought was a secure door provides legally sufficient evidence to support a finding of family violence. *See Boyd*, 425 S.W.3d at 430 (concluding that appellant committed act of family violence when he blocked appellee's car with his body and jumped on hood of car).

Nor is the evidence factually insufficient to support entry of the protective order. According to Herbert, he went to Patricia's home that evening and fought his way in through the backdoor because—notwithstanding the fact that he had been on the phone with her within the past hour and all was well—he knew

15

Patricia took medication and was not sure if she was alright. He also stresses that he and Patricia maintained an intimate relationship, traveled together, and each had keys to one another's homes. On the basis of such facts, he maintains that Patricia could not credibly have been fearful of him absent some intervening overt physical violence or express threat.

Nevertheless, because the trier of fact is the sole judge of witness credibility and the weight to be given their testimony, *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied), the trial court was free to place greater weight on Patricia's testimony and to conclude that Herbert's actions during the August 2014 incident placed Patricia in reasonable and imminent fear for her safety. Evidence supporting the trial court's finding that family violence occurred is not so weak as to be clearly wrong or manifestly unjust and is therefore factually sufficient.[2]

---

[2]    Herbert complains that the trial court improperly admitted unauthenticated photographic evidence purporting to show Patricia's bruised and injured body and the broken storm door. He argues that, without this improperly admitted evidence, there is insufficient evidence to support entry of the protective order. The trial court twice asked Herbert whether he wished to make any objections to photographs presented by Patricia. And twice, Herbert unequivocally responded that he had no objection. In failing to make objections before the trial court, Herbert waived any complaint on appeal regarding the admission of evidence. *See* TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a); *see, e.g.*, *Comiskey v. FH Partners, LLC*, 373 S.W.3d 620, 629–30 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). Accordingly, we may consider the photographs in our sufficiency analysis. We note, however, that our conclusion that the trial court's family violence finding is supported by sufficient evidence does not depend on the

## Conclusion

We affirm the trial court's protective order.

Rebeca Huddle
Justice

Panel consists of Justices Higley, Huddle, and Lloyd.

---

photographs and would be the same even if the photographs had not been admitted.